Carnegie-Illinois Steel Corp. *v.* United Steel-
workers of America et al., Appellants.

Argued February 11, 1946. Before Maxey, C. J., Linn, Patterson, Stearne and Jones, JJ.

*Eugene Cotton,* with him *Lee Pressman, Frank Donner, Sylvan Libson* and *Joseph Sharfsin,* for appellants.

*Elder W. Marshall,* with him *Seward H. French, Jr.,* and *Reed, Smith, Shaw & McClay,* for appellee.

*Marjorie Hanson Matson,* for American Civil Liberties Union, amicus curiae.

*Harry Sacher,* with him *Abraham J. Isserman* and *Saul C. Waldbaum,* for U. E. R. M. W. A., F. T. A., T. W. U. and N. F. C. L., C. I. O., amici curiae.

*W. J. Woolston,* with him *Louis F. McCabe,* for National Lawyers' Guild, amicus curiae.

OPINION BY MR. CHIEF JUSTICE MAXEY, February 13, 1946:

The plaintiff filed a bill in equity against the defendants, making certain allegations as to the commission of acts of force and violence against employes of the plaintiff and interfering with the ingress of such employes to the plaintiff's property, an extensive steel works situated at Homestead. These employes who were allegedly barred from plaintiff's plant were not engaged in the work of producing steel and were in no sense of the term "strike-breakers". None of the manufacturing and productive facilities at the Homestead Steel Works have been in operation at any time during the strike. These barred-out employes were assigned to the work of maintaining the power-houses, the boilers, the pumps, the steam lines and the sprinkler system, and to guard against the constant hazard of fire and to prevent the freezing of water lines essential to water cooling systems in the plant. The steam lines and water lines in the plant total several hundred miles in length. The work of these maintenance men was essential to the keeping of the steel plant in condition to resume the production of steel as soon as the steel strike should come to an end. The maintenance employes are members of the labor union which is conducting the strike. The maintenance of the plant also required the presence inside of the plant of superintendents and foremen and their assistants to supervise the work of the maintenance men. That the property of the plaintiff, which represents an original investment of over $60,000,000 and which is now valued at approximately $120,000,000 must be protected and maintained at all times, even when production is stopped by strikes, is self-evident. Eleven of the fifty-eight open hearth furnaces at the Homestead Works of the steel corporation are the property of the Reconstruction Finance Corporation, that is, they belong to the American people. The cost

of the Government owned facilities of this plant is said to be $90,000,000.

The complaint alleged that from the commencement of the steel strike until 12:01 A. M. January 26, 1946 the union pickets at the gates of the plaintiff's steel plant at Homestead "permitted free access to said properties of the plaintiff for all personnel scheduled by plaintiff to perform such essential maintenance of said properties" but "on January 25, 1946, said International Union and Local Union 1397 advised plaintiff that commencing with the hour of 12:01 A. M., January 26, 1946, it would no longer permit access to the Homestead Steel Works, of any of the supervisory personnel of the plaintiff below the level of department superintendents and has since that date uniformly denied access to said properties of all assistant foremen, foremen, assistant general foremen, and general foremen and assistant department superintendents and other employes of plaintiff". The complaint further sets forth that "pickets have continued to congregate at said gates [leading to the plaintiff's steel plant] in larger groups numbering up to two hundred (200) persons, and through mass picketing, standing shoulder to shoulder several deep, have refused entrance and access to said Works to all supervisory and other personnel employed by the plaintiff who have sought to enter said Works, excepting only the Works Superintendent and the Department Superintendents."

The bill alleges that the unlawful acts of the defendant Local Union "have caused and are causing . . . great and irreparable loss, damage and injury" to the plaintiff corporation. It is further alleged in the bill that "defendants have seized, held the plants, equipment, machinery and property of the plaintiff hereinbefore described as the Homestead Steel Works and have deprived plaintiff of the use."

The plaintiff asked for an injunction preliminary until final hearing and perpetual thereafter to restrain

and enjoin the defendants from "(a) Interfering with, hindering or obstructing the agents, servants and employes of the plaintiff engaged in the performance of their work assignments for the plaintiff at the Homestead Steel Works or in the operation and maintenance of plaintiff's properties;

"(b) Preventing or attempting to prevent any person or persons, whether employes of the plaintiff or others, from freely entering or leaving the plaintiff's plants and properties at said Homestead Steel Works;

"(c) Conspiring, combining, confederating, agreeing or arranging with each other or with any other person or persons, organizations or associations, to interfere with or injure the plaintiff in the conduct of its lawful operations at the Homestead Steel Works," by massed picketing, threats or acts of violence, force or show of force, or other means of intimidation or coercion.

In support of plaintiff's bill there were filed fourteen injunction affidavits. The general superintendent of the Homestead Steel Mill of plaintiff corporation filed an injunction affidavit stating that on January 25, 1946 he was notified in a telephone conversation with Frank Casper, President of the United Steel Workers of America, Local 1397, that "the Union had decided that . . . no supervision below the level of Department Superintendent would be admitted to the plant, and that the agreement which we had made permitting free access to and from the plant by all supervisors was at an end."

Other injunction affidavits make allegations as follows:

On January 25, 1946, a large group of pickets, estimated to be from one hundred to two hundred in number, standing three deep, extended across the gate and blocked the entrance to plaintiff's Homestead plant and thus denied access to the plant to individuals below the rank of superintendent. On January 29, 1946, at

8:30 in the evening (after suit had been instituted in the instant proceeding), Arthur H. McGurk, who desired to enter the Homestead Plant for the purpose of securing some equipment from his locker, was grabbed by pickets at the 48″ mill gate and forcibly detained within the boundaries of the plant. He was escorted from company property by pickets, across the tracks of the Pennsylvania Railroad Company and up a bank to a point on a driveway near Eighth Avenue. He was placed, against his will, in the seat of a red open-body truck, between the driver and another picket, and taken to a point in front of and across from the Union headquarters at Eighth and Dickson Streets. Upon alighting from the truck he attempted to make a break, stumbled and fell— one of the pickets falling on top of him, injuring his left knee and left breast and tearing his clothes. He was then forcibly taken into custody, escorted into the Union hall, where a great number of individuals were present, and was then taken into a private office and the door locked. The door was later opened by a man identified as John Bresko. McGurk was then released and went directly to his home, arriving there about 9:30 P. M. E. J. Horgan was on the night of January 29, 1946 admitted by the pickets to the plant and was told by one of the pickets, James R. Conroy, that any supervisors who used the 48″ mill gate would be taken out of the plant; that threats were made by others in the group "that there would be bloodshed if management did not stop making use of the 48″ Mill Gate." William E. Crouch, Jr., in his injunction affidavit, states that on the 26th day of January, 1946, at 2:15 A. M., while attempting to enter the Homestead Steel Works between the hot metal bridge and the 48″ mill gate, an unknown picket grasped his arm and later six or seven other pickets forcibly prevented his progress toward the mill, escorted him across the tracks, up the bank, searched him, and then placed him in an automobile, seating him

in the back seat between two pickets. He was forcibly restrained by the pickets and the captain of the pickets he identified as a man called "Red." The threatening attitude of the pickets and the suggestion that he was lucky he had not been beaten up caused him to answer their questions. He was restrained by the pickets for an hour or an hour and a quarter and was released later through the efforts of Mr. Feit.

There were other similar injunction affidavits filed, all purporting to show that supervisory officials were denied access to plaintiff's plant and that the defendant labor union and its officials and agents had arrogated to itself and themselves the authority to determine what employees of the plaintiff corporation should and should not, respectively, enter the corporation's plant, and that the Union enforced its assumed authority by massing approximately 200 pickets at the gate leading into the plant.

The court below in response to the above bill of complaint supported by the above injunction affidavits and others, granted the injunction prayed for and ordered that it should continue until a hearing was held in that court on a motion for the injunction's continuance, and 10:00 A. M. February 11th was fixed as the time of that hearing.

The court in its opinion made the following apt statement: "Picketing which results in the intimidation and coercion of officers and employes of the plaintiff and denies workmen from legitimate business access to plaintiff's plant is not legal picketing. Picketing which results in the kidnaping of individuals and placing them under restraint and depriving them of their personal liberty is not legal picketing. Picketing which consists of at least one hundred or more pickets massed and grouped together at the main entrance of a plant for the purpose of denying the right of access is not legal picketing."

The court also quoted the following excerpt from a memorandum sent by the American Civil Liberties Union to Philip Murray, President of the Congress of Industrial Organizations, and William Green, President of the American Federation of Labor, and the heads of unions engaged in current strikes:

"Picketing, as the Courts have held, is a form of free speech and assembly and is supported on that principle. The only limitation by public authorities on picketing supported by the [Civil Liberties] Union are those to keep traffic open for pedestrians and vehicles, to insure access to places picketed, to prevent the use of fraudulent signs, and to maintain order. The [Civil Liberties] Union has supported mass picketing where these conditions are met. But no claims of the rights to picket justify the use of force to prevent access to plants on strike by those who are willing to cross picket lines. Reports of current strikes show instances in which pickets have prevented access to plants by executive officers, by maintenance crews keeping up such services as heat and lighting, and by clerical workers not members of the striking union. These are plain abuses of the rights of picketing. In the view of the American Civil Liberties Union, the right to access, not only of these persons but of any and all others, is undebatable.

"The two rights—of picketing and of access to places picketed—are not conflicting."

The defendants filed an appeal to this Court alleging that under the laws of Pennsylvania the court below had no power to grant the preliminary injunction asked for. Appellants then petitioned this Court to fix a special day for the hearing of this appeal. This petition we granted at once. The appeal was heard on February 11th and counsel respectively representing the opposing parties were given all the time they requested to present their arguments. The American Civil Liberties Union filed a brief as amicus curiae. We have since given due

consideration to this case and to the arguments of the respective counsel.

The rule is well settled that in considering appeals from preliminary injunctions our review is limited to determining whether plaintiff has shown apparent ground for granting the temporary restraint: *Yale Knitting Mills v. Knitgoods Workers,* 334 Pa. 23; *Com. v. Rosenblit,* 347 Pa. 7. The bill and supporting affidavits clearly make out a prima facie case for equitable relief.

The Act of June 9, 1939, P. L. 302, 43 P. S. 206 d, amending the Anti-Injunction Act of 1937, P. L. 1198, 43 P. S. 206 a, b, c, completely restores to the courts of common pleas the equitable powers exercised by them since the Act of June 16, 1836, P. L. 784, 17 P. S. 281, prior to the Act of 1937, for causes which fall within the terms of the 1939 Amending Act: *Western Pa. Hospital et al. v. Lichliter et al.,* 340 Pa. 382.

Section (a) of the Act of June 9, 1939, P. L. 302 removes the restriction imposed by the Act of June 2, 1937, P. L. 1198 on the granting of preliminary injunctions on the filing of a bill supported by injunction affidavits, if the acts sought to be enjoined involve "a labor dispute, as defined herein, which is in disregard, breach, or violation of, or which tends to procure the disregard, breach, or violation of, a valid subsisting labor agreement arrived at between an employer and the representatives designated or selected by the employes for the purpose of collective bargaining." The court below in its opinion said: "That there was a meeting of the minds resulting in agreement between the Union and Management relative to the personnel to be admitted to ingress to and egress from the plant during the strike is evidenced by the affidavit of Mr. McIlvried. We construe the action taken on January 19, 1946, as set forth in said affidavit to constitute a contract that comes within Section (a) of the Act of 1939 [above quoted]."

Section (d) of the Act of June 9, 1939, P. L. 302, 43 P. S. 206 d, removed the restriction imposed by the

Act of June 2, 1937, P. L. 1198, 43 P. S. 206 a, b, c, on the granting of preliminary injunctions on the filing of a bill supported by injunction affidavits "Where in the course of a labor dispute as herein defined, an employe, or employes acting in concert, or a labor organization, or the members, officers, agents, or representatives of a labor organization or anyone acting for such organization, seize, hold, damage, or destroy the plant, equipment, machinery, or other property of the employer with the intention of compelling the employer to accede to any demands, conditions, or terms of employment, or for collective bargaining."

Forcibly to deny an owner of property or his agents and employes access to that property for the purpose of protecting and maintaining it and its equipment or for any other legitimate purpose is in practical and legal effect a seizure or holding of that property.[1] Such a lawless seizure of property no government worthy of the name will tolerate or condone. The employment of hostile force against persons and property is exclusively a governmental function, and exercisable even by the government only by due process of law. When any individual or organization under whatsoever name attempts to use force to gain his or its ends they are attempting to usurp governmental functions. This attempt unless promptly and effectively restrained by legally constituted authority leads to lawlessness, disorder and anarchy, which is the very negation of all government. The law cannot temporize with lawlessness. *The first duty of government is to govern,* that is, to maintain law and order at all hazards and regardless of expense; only by doing this does it fulfill its legitimate function, which is the protection of life, liberty and property.

---

[1] To deprive one of the use of his property is to deprive him of his property, for as Lord Coke said: "What is land but the uses thereof?": Co. Litt. 4 b (see *People v. Kerr*, 37 Barb. N. Y. 357, 399).

Nowhere in the defendants' voluminous brief or in their hour's oral argument before the Supreme Court, was it asserted that the affidavits in response to which this injunction was issued were *untrue*. The defense was that on the state of the record (no hearing having been had) the court had no power to issue the injunction. This contention we overrule. When property needs protection from the acts of lawless groups, it needs it *at once*. Delays are dangerous. It is self-evident that such a vast and complex structure as plaintiff's plant, representing an investment of over $200,000,000, could be irreparably injured by failure of proper maintenance and protection against fire and other hazards, for even a day or a lesser period. The lack of protective vigilance for even a few minutes has, at times, resulted in great conflagrations in cities and, at other times, in the loss of ocean liners. An hour's protective vigilance on the morning of December 7th, 1941 would have saved this nation millions of dollars worth of battleships and over thirty-five hundred lives at Pearl Harbor. "Nine-tenths of wisdom consists in being wise in time."

When this case reached this court and the record was before us, it then became our duty to decide whether or not the facts showed that what the defendants were doing constituted a "holding" or "seizure" of the plant or any part of it. The holding or seizure of even one gateway to the plant entitled the plaintiff to the protection of a court of equity just as fully as would the seizure of the entire plant. When a "picket line" becomes a picket *fence* it is time for government to act. Collective coercion is not a legitimate child of collective bargaining. The forcible seizure of an employer's property is the very essence of communism.

Injunctions are not issued against picketing when the latter's only purposes are to advertise the fact that there is a strike in a certain plant and to persuade workers to join in that strike and to urge the public

not to patronize the employer. For these purposes, a limited number of pickets is all that is necessary.[2] But when hundreds of pickets are massed, as at least two hundred were here at a single gate, it is obvious that this force was not mustered for a peaceful purpose. When, as here, this force denied to the supervisors and to other maintenance personnel access to plaintiff's plant, when such personnel were "grabbed by pickets" and "forcibly detained", when other pickets threatened "bloodshed if management did not stop making use of the 48 "Mill Gate", when the superintendent of one of the mills is "stopped by seven or eight pickets", forcibly placed in an automobile and held under restraint for one hour and told that some other employees "had been beaten up and he was lucky that he was not", and that "they could throw him over the river bank", when superintendents and other executives of the plaintiff's corporation are halted by "pickets massed in a solid group" and told that they cannot get into the plaintiff's plant "if they do not have a Union Pass", and when such and similar acts of lawlessness are certified to in more than a dozen affidavits of apparently responsible persons, it is time for the agencies of government to act and to re-establish law and order. Government means restraint and where self-restraint is wanting, external restraint must be applied. A government that yields to lawlessness is abjectly surrendering to anarchy. It invites and merits contempt. No law-abiding citizen objects to being officially informed that he cannot act unlawfully. The injunction issued in this case impinged on no one except persons acting unlawfully or planning to act unlawfully. It offended no one who acknowledges the supremacy of the law.

An injunction such as was issued in this case is not likely to be used by any court without a prima facie

---

[2] In the instant case, the court limited the number of pickets at each gate to ten.

showing of just cause for it and no individual or organization is justified in feeling himself or itself aggrieved if he or it is "temporarily restrained" (as were these defendants) "from interfering with, hindering or obstructing the agents, servants and employees of "an owner of property" by mass picketing, threats or acts of violence, force or show of force or other means of intimidation or coercion" or from "conspiring . . . to interfere with or injure" an owner of property "in the conduct of its lawful operations . . . by acts of intimidation or violence . . . or by any conduct which tends to deprive any such employee [of the owner of the property] or other person of the free enjoyment of his legal rights or access to and from" the owner's property. When *so* restrained, a defendant is specifically forbidden to do those things which the law, both civil and criminal, condemns and which would, unless prevented, cause irreparable injury to another's property.[3]

---

[3] Samuel Gompers, President of the American Federation of Labor for more than a third of a century, said in his Report to the Federation at its annual convention in Atlantic City in 1911: "The trade-unionist holds that an injunction rightfully lies to protect from injury, property or a property right of the party making the application, for whose injury there is no adequate remedy at law". (Quoted from page 164 of "Samuel Gompers" by Roland Hill Harvey.)

In a book written on "The Labor Injunction" by Felix Frankfurter and Nathan Greene, those authors say: (p 33) "Nowhere may picketing be accompanied by violence; and where violence softens into 'intimidation,' 'threats' or 'coercion' the result is the same, because analysis assumes the inevitability of violence." (Citing cases) In describing the procedure in injunction cases, these authors say: (p. 55) "If, however, the complaint indicates that the danger of irreparable injury is too imminent to risk delay, a temporary restraining order may issue forthwith until a hearing can be had." (Citing cases) (p. 56) "On direct appeal, abuse of discretion alone is reviewed." (Citing cases).

In his fifth annual message to Congress on December 5, 1905, President Theodore Roosevelt said: "What is due notice [to the adverse parties before granting the writ of injunction] must depend on the facts of the case; it should not be used as a pretext to permit violation of law or the jeopardizing of life or property." (p. 332)*

When courts issue injunctions in cases like this, they are *not* (as some claim) "throwing the weight of their power on one side of the balance in an economic controversy arising out of the employer and employee relationship" any more than a baseball umpire who enforces "the rules of the game" against a *disorderly* and *lawless* player is "throwing the weight of *his* power" in favor of one of the contestants. Violence or threats of violence against employers or the latter's property never helped any labor union or group of employees to win a strike and it is a matter of history that the greatest leaders of American labor [4] always insisted that their

The same President said in his sixth annual message to Congress on December 3rd, 1906: "If men seek to destroy life or property by mob violence, there should be no impairment of the power of the courts to deal with them in the most summary and effective way possible." (p. 407)*

The same President said in his seventh annual message to Congress on December 3rd, 1907: "The process of injunction is an essential adjunct of the court's doing its work well; and as preventive measures are always better than remedial, the wise use of this process is from every standpoint commendable." (p. 507)*

(* All the quotations from President Theodore Roosevelt, used in this opinion, may be found on the pages indicated, in Vol. 17 of the "Works of Theodore Roosevelt".)

President Grover Cleveland telegraphed to John P. Altgeld, Governor of Illinois, on July 6th, 1894 as follows: "It seems to me that in this hour of danger and public distress discussion may well give way to active effort on the part of all in authority to restore obedience to law and to protect life and property." (Vol. 2, p. 163 of "Grover Cleveland, The Man and The Statesman", by Robert McElroy).

[4] In a book written in 1903 entitled "Organized Labor" by John Mitchell, President of the United Mine Workers of America, that very successful and highly respected labor leader in a chapter on the "Proper Conduct of a Strike", said: (p. 317) "Above all and beyond all, the leader entrusted with the conduct of a strike must be alert and vigilant in the prevention of violence. The strikers must be made constantly aware of the imperative necessity of remaining peaceable . . . Under no circumstances should a strike be allowed to degenerate into violence . . . No matter how just the demands of

followers refrain at all times from threats or acts of violence against employers and the latter's property. Lawless acts never bring enduring success to the actors. Eminent friends of American labor law have pointed out the damage done to the cause of labor when those who when on strike committed acts of violence against persons or property.[5] Labor when well led is law-abiding.

the men, no matter how unreasonable and uncompromising the attitude of the employer, the commission of acts of violence invariably puts the strikers in the wrong'. . . . A strike or a lockout is coercion, but it is lawful, whereas a resort to physical force is both immoral and unlawful . . . It is sometimes claimed that no strike can be won without the use of physical force. I do not believe that this is true, but if it is, it is better that the strike be lost than that it succeed through violence and the commission of outrages."

Samuel Gompers, President of the American Federation of Labor, said in 1910: "I would not consciously violate a law now or at any time during my whole life." (Quoted from p. 160 of Rowland Hill Harvey's book "Samuel Gompers".)

[5] President Theodore Roosevelt said in his fourth annual message to Congress on December 6th, 1904: (p. 252) "When any labor-union seeks improper ends, or seeks to achieve proper ends by improper means, all good citizens and public servants must oppose the wrong-doing as resolutely as they would oppose the wrong-doing of any great corporation. Violence, brutality, or corruption, should not for one moment be tolerated. Wage-workers have an entire right to organize and by all peaceful and honorable means to endeavor to persuade their fellows to join with them in organizations . . . They have under no circumstances the right to commit violence upon those, whether capitalists or wage-workers, who refuse to support their organizations; mob rule is intolerable in any form."

The Anthracite Coal Strike Commission of 1902 reported, inter alia, as follows: "The strike ordered by a trade union, which compasses no more than the enforcement of demands previously made, for the supposed benefit of its members, by the cessation from work in the event that those demands are not complied with, transgresses no law of a free society, and, whether wise or unwise in inception and purpose, is an exercise of no more than the legal rights that belong collectively or individually to its members . . . But a strike set on foot with the view to the accomplishment of its purpose by intimidation or violence, exercised against those who choose to remain at work, violates the law from the beginning." "Peace and order should be maintained at any cost." (Senate Documents Vol. I, 58th Congress Special Session, Book 1903, pp. 74, 83).

The injunction now appealed from is only a temporary one until a hearing is had. If the facts as developed at the hearing do not justify the continuance of the injunction it must be dissolved forthwith. If the facts warrant its continuance it *will* be continued.

The injunction issued in this case *does not* in any way bring about any of those four "abuses in labor litigation" which the Act of June 2, 1937, P. L. 1198, 43 P. S. 206, a, b, c, was expressly designed to abolish. These are the reasons why:

(1) "The status quo" was *not* "altered by the injunction". The defendants possessed every legal right they possessed before the injunction was issued. Their right to strike was in no way impaired, neither was their right to engage in lawful picketing. The defendants never possessed the right to do any of those unlawful acts which they were enjoined from doing.

(2) The affidavits in response to which the injunction was issued were not "contradictory" and they were *not* "untrustworthy". Their trustworthiness is so far unchallenged.

(3) If there was an error in issuing the "injunctive relief",—and none has yet appeared—it has caused "the opposing party" *no* "irreparable" injury. No party can be legally injured by being enjoined from committing *illegal* acts.

(4) There was no delay in the "course of appellate practice" in this case. The appeal was promptly taken

---

In his address on "Injunctions in Labor Disputes" delivered by George Wharton Pepper before the American Bar Association in July, 1924, he deprecated any failure "to recognize the difference between the self-protection of an industrial class [by strikes and non-violent picketing] and mere wanton conspiracy to injure property and business." He pointed out that "our British friends have come to recognize peaceable picketing as a legitimate concomitant of a strike, but have trained the guns of their criminal procedure upon conduct which threatened breach of the peace or invasion of private rights." ("Reports of American Bar Association" Vol. 49, 1924, p. 174, 177).

and promptly heard at a special session of this court called for that purpose and an immediate hearing was ordered.[6]

We dismiss this appeal and order the immediate return of the record to the court below, and we direct that court to hear the case on Monday, February 18, 1946, at 10:00 A. M.  The costs will abide the event.

Mr. Justice DREW and Mr. Justice HORACE STERN did not sit in this case.

Mr. Justice JONES dissents.

---

[6] This hearing was later postponed at defendants' request.

---

DISSENTING OPINION BY MR. JUSTICE JONES:

I dissent from the order entered by the Court in this case.  Because of the importance of the principle involved, a statement of the views impelling my action seems not inappropriate.

Before entering upon that, however, it may be helpful to a correct understanding of what the matter for decision at this stage of the case really is (as I apprehend it to be) to point out that the sole question here involved is whether an injunction may be issued in a case "involving or growing out of a labor dispute" solely upon a complainant's ex parte affidavits and without a hearing on the merits of the complaint and answer thereto by the parties sought to be enjoined.  That question is all that has yet been before this Court.

It should go without saying,—lawlessness can never be made the predicate of a legal right; and a legal right, where one already exists, may be completely forfeited because of the unlawful conduct of the one attempting to assert it.  No sensible person would think of suggesting to the contrary for a moment.  But, any such generalizations, valid though they be, relate to *substantive*

rights and responsibilities and are wholly immaterial to the *procedural* question around which the litigation in this case to date has exclusively revolved.

Nor was the competency or probative value of the complainant's ex parte affidavits established in this case because counsel for the defendants had not, either in his brief or in his oral argument, "asserted that the affidavits in response to which this injunction was issued were *untrue*." Of course, counsel did not so assert and very properly so. There is not yet in the record in this case any refutation by the defendants of the averments of the complaint or the affidavits and, for the all-sufficient reason, that the temporary injunction, now here on appeal, was issued before an opportunity to answer and be heard was accorded the defendants. Actually, from a legal standpoint, it would not have been proper for the defendants' counsel to have asserted on the appeal that the affidavits were untrue. Upon an appeal from a temporary injunction, the facts as averred by the complainant are *assumed* to be true for the purpose of treating with the legal questions raised. Whether the affidavits in this case are true or untrue *in fact,* no court can adjudicate in advance of a hearing on the merits and that, admittedly, has not been had.

Whether any one is "offended" by the issuance of the injunction in this case is equally beside the point. No one has any right to be "offended" by what the law directs even when erroneously construed and applied. There is always a way open under our system of government for the correction of legal error by lawful and orderly procedure. Only by pursuing that course can "the supremacy of the law", which is so essential to the rights and liberties of all, be maintained. There is no difference between the majority and myself as to that. Our one crucial difference in this case is as to whether the pertinent law, *as written,* requires a hearing before an injunction may be issued in *any* case "involving or growing out of a labor dispute". To that question I shall now address myself.

Section 9 of the Act of June 2, 1937, P. L. 1198 (43 P. S. § 206i), commonly known as the Anti-Injunction Act, provides that,—"No court of this Commonwealth shall issue any restraining order or a temporary or permanent injunction in any case involving or growing out of a labor dispute, except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of fact by the court to the effect—[as follows] . . .".

Then follows a specification of the essential findings that a trial court must be able to make, *after the required hearing,* before issuing a restraining order or a temporary or permanent injunction in *any* case "involving or growing out of a labor dispute." A further paragraph of Section 9 contains a provision that " . . . *no affidavits shall be received in support of any of the allegations of the complaint."* (Emphasis supplied).

In certain specified circumstances in cases "involving or growing out of a labor dispute" injunctions may be issued under the Act of 1937 but only "on the basis of findings of fact made and filed by the court", as provided by Section 12, consequent upon the hearing required by Section 9.

Such was the state of the law under the Anti-Injunction Act of 1937. That the instant case is one "involving or growing out of a labor dispute" is not denied nor could it well be. It follows, therefore, that under the Act of 1937, as originally enacted, the court below was without "jurisdiction or power" to issue an injunction such as was done in this case, no hearing as required by the Act of 1937 having been had. In fact, as I understood counsel for the complainant at bar, he frankly, and I think correctly, conceded as much.

However, the Act of 1937 was amended by the Act of June 9, 1939, P. L. 302, Section 1 (43 P.S. § 206d) by adding to Section 4, which is retained intact, a proviso in part here material as follows:

". . . Provided, however, That this act shall not apply in any case—

"(a) Involving a labor dispute, as defined herein, which is in disregard, breach, or violation of, or which tends to procure the disregard, breach, or violation of, a valid subsisting labor agreement arrived at between an employer and the representatives designated or selected by the employes for the purpose of collective bargaining, as defined and provided for in the [Pennsylvania Labor Relations] act [1937, P. L. 1168], . . . or as defined and provided for in the National Labor Relations Act, approved the fifth day of July, one thousand nine hundred and thirty-five. . . ."

* * *

"(d) Where in the course of a labor dispute as herein defined, an employe, or employes acting in concert, or a labor organization, or the members, officers, agents, or representatives of a labor organization or anyone acting for such organization, seize, hold, damage, or destroy the plant, equipment, machinery, or other property of the employer with the intention of compelling the employer to accede to any demands, conditions, or terms of employment, or for collective bargaining."

The court below, on the basis of the complainant's ex parte affidavits, found that a valid labor agreement subsisted between representatives of the employer and officers of the local union, which the defendants had breached, and thereupon concluded that by virtue of the 1939 amendment the Anti-Injunction Act of 1937 was inapplicable and interposed no limitation in this case upon the court's equity jurisdiction or power as it exists without the Act of 1937. It was on that ground alone that the court below based the temporary injunction here involved. With respect to the complainant's allegations that its "plants, equipment, machinery and property" had been seized and were being held adversely through the operation of mass picketing, the court below

specifically found that *"this situation does not yet exist."* (Emphasis supplied).

The alleged "labor agreement" so found by the court, as above stated, was manifestly *not* of the character of agreement either contemplated or specified by the amendment of 1939. It had not been entered into by "the representatives designated or selected by the employes for the purpose of collective bargaining" as defined either by the Pennsylvania Labor Relations Act or by the National Labor Relations Act, which the 1939 amendment requires. Not only did counsel for the complainant substantially so concede at bar but the bill itself avers,—"Fourth : For some years the International Union has been recognized by the plaintiff pursuant to the provisions of the National Labor Relations Act, as the exclusive representative, for purposes of collective bargaining of all employees of the plaintiff employed in and about the plaintiff's steel-manufacturing and by-product coke plants, . . ." No agreement with the International Union, *the bargaining agent* thus pleaded by the complainant, is averred in either the bill or the affidavits. The agreement found and acted upon by the court below was a purely local arrangement with reference to the maintenance personnel needed to take care of the company's plant and property during the strike. It *was not subsisting* at the time the labor dispute arose. It followed the dispute by several months and was not arrived at until after the strike had already been called for a subsequent date. It was a consequence of the dispute and was designed to accommodate conditions expected to result from the impending strike.

Consequently, even imputing to the amendment of 1939 the effect which the court below gave it with respect to the Act of 1937, there is no ground apparent to me upon which the injunction can be sustained on the findings and conclusions made by the court below from the complainant's bill and its ex parte affidavits.

But, beyond that, the broad fundamental question here involved is whether the inhibitions of a statute of the State can be completely avoided by ex parte representations to the court that the circumstances, which render the Act inoperative, exist. I think not.

The amendment of 1939 adds but a *proviso* to one section of the Act of 1937. It does not seem admissible to impute to the legislature an intent in the amendment of 1939, thereby to work a virtual repeal of the mandate in the Act of 1937 that a hearing must precede the issuance of an injunction in any case "involving or growing out of a labor dispute." In fact, the legislative intent appears to be quite the contrary. Nor am I unmindful that the amendment of 1939 provides "That this act shall not apply in any case" involving one or more of the situations described in the immediately ensuing paragraphs (a), (b), (c) and (d). Until the legislature speaks more plainly and directly than it has to date, that it is *its* intention to do away with the hearing required by the Act of 1937, I have no alternative but to abide by the law as, in my opinion, it is written.

The Act of 1939 purports to be no more than an amendment. For that situation, the legislatively prescribed rules of statutory construction, by which we are bound, pertinently provide that "Whenever a section or part of a law is amended, the amendment shall be construed as merging into the original law, become a part thereof, and replace the part amended and the remainder of the original law and the amendment shall be read together and viewed as one law passed at one time; . . . ". See Statutory Construction Act of May 28, 1937, P.L. 1019, Art. V, Sec. 73, 46 P.S. § 573. The amendment of 1939 is, therefore, to be interpreted and applied in the light of the public policy declared by the Act of 1937 which the amendment of 1939 in nowise repudiates. Indeed, the amendatory Act of 1939 expressly confirmed the procedure for the issuance of injunctions (where permissible) in cases growing out of

labor disputes, as well as the public policy declared by the Act of 1937.

Thus, in amending the Act of 1937 by adding paragraphs (a), (b), (c) and (d) to Section 4 thereof, the amendment of 1939 specifically re-enacted Section 4, as it originally stood, without change, so that Section 4, since the amendment of 1939 just as before, provides that "No court of this Commonwealth [has] jurisdiction to issue any restraining order or temporary or permanent injunction in a case included within [the 1937] act, except in strict conformity with the provisions of [that] act, *nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in [the 1937] act . . .*" (Emphasis supplied).

And what was the public policy so declared? In part here important, it was that "Equity procedure that permits a complaining party to obtain sweeping injunctive relief that is not preceded by . . . notice to and hearing of the responding party . . . or that permits sweeping injunctions . . . upon written affidavits alone and not . . . upon examination, confrontation and cross-examination of witnesses in open court is peculiarly subject to abuse in labor litigation. . . ." In effectuation of the public policy thus declared, the legislature thereupon directed that *no* order or temporary or permanent injunction should be issued by a court of this State in a case growing out of a labor dispute except after the hearing provided for by Section 9 to which reference has already been made. No one will deny that the right to declare and, within constitutional bounds, to subserve public policy lies exclusively with the legislature.

What the amendment of 1939 did, therefore, was to add four instances in which injunctions could be issued if the essential facts in support thereof were established and found as a result of the hearing required by the Act of which the amendment is an integral part. That is the

only way in which the Act and the amendment can be "read together and viewed as one law passed at one time", as we are required to read and view them, without doing violence to either.

After the amendment of 1939, just as prior thereto, anyone entering a court to seek an injunction in a case growing out a labor dispute is at once confronted with the Act of 1937. To overcome its restrictions on the court's power to grant the relief sought in such instance, the complainant must establish the existence of the conditions said to make that Act's restraints inapplicable. The merit of such matters is to be determined after a full hearing of all parties to the record in open court as provided for by the Act. Until that is done, no court can competently adjudicate that there are present the conditions which render inoperative the restrictions of the Act of 1937 on the court's jurisdiction or power. It is not enough simply to *aver* that such conditions are present. To say that a court can remove itself from the restrictions of the Act of 1937 on the basis of ex parte affidavits and so obviate the hearing required by the Act is a "bootstrap-lifting" proposition.

And, the same may be said for the requisite proof of a seizure, holding, damaging or destruction of an employer's plant in order to render the Act of 1937 inapplicable. The amendment of 1939 does not say that, upon *an averment* of such seizure, etc., the Act of 1937 shall not apply. The Act provides that, "Where in the course of a labor dispute . . . employes . . . seize, hold, damage, or destroy the plant . . ." of the employer, then the Act of 1937 shall not apply. But, until the existence of that condition is found by the court as a result of the hearing required by the Act, the Act of 1937 continues to obtain in full force and effect; and a preliminary restraining order or temporary injunction may not be issued on ex parte affidavits.

It may well be that, upon such a hearing, the court could justifiably find that the employer's plant has been

seized, is being held or is threatened with damage or destruction. Upon such finding, competently made after the required hearing, the Act of 1937 by its terms, as amended, allows for the issuance of an injunction for the protection of property and the owner's right to the use of it. Picketing to be lawful must be peaceful. Where picketing consists of people massed about a plant or its entrance gates with the compactness of a Macedonian phalanx, the fact that the picketing remains peaceful may be so only because no one can with safety attempt to go through the line. In such circumstances, it could hardly be thought a violent legal conclusion to hold that the plant had been seized and was being held against the owner's right to it. But, failing the hearing required by the Act, that condition has not yet been shown to exist in this case as the court below actually found.

The interpretation now given the amendment of 1939 returns us in Pennsylvania to the practice of issuing injunctions in cases growing out of labor disputes upon ex parte applications supported by no more than self-serving injunction affidavits. Henceforth the Anti-Injunction Act of 1937 can be by-passed at any time by a mere averment in an untested affidavit in an ex parte proceeding, regardless of whether the affidavit is ultimately sustained by proof or not. If it is not so sustained, the abortive injunction will none the less have created and maintained an unwarranted status in the meantime. The majority opinion plainly states that "The [amendatory] Act of June 9, 1939 . . . completely restores to the courts of common pleas the equitable powers exercised by them since the Act of June 16, 1836 . . . for causes which fall within the terms of the 1939 Amending Act." It follows, therefore, that any affidavit drawn to depict a situation that may be ascribed as fitting "the terms of the 1939 Amending Act" (even an allegation of an agreement which, as here, is not requisitely shown to exist), is sufficient to justify the is-

suance of an injunction upon ex parte affidavits in a case growing out of a labor dispute. Thus, by an amendment of the Anti-Injunction Act of 1937, that Act, as now construed, becomes for all practical purposes a dead letter. That, I think is regrettable, and especially so, as I am unable to perceive any basis in law or logic for the construction now placed upon the amended Act.

The effect of the decision now made is not hard to foresee. Without a hearing on the merits of the material issues of fact involved, the courts will again be called upon to throw the weight of their power on one side of the balance in an economic controversy arising out of the employer and employee relationship. That situation will help no one,—labor, management or the public.[1] Industrial disputes will never be settled justly or satisfactorily by the arbitrary exertion of power by anyone; and that means employers, employees and the courts as well.

A hearing need not unnecessarily delay a disposition of a matter such as the present. If irreparable injury or damage to property or to the employer's use of its property is being done or threatened, a hearing on an injunction application could be had speedily. It would be up to the trial court to see that the hearing was conducted expeditiously so that the court could adjudicate the material issues promptly and grant or refuse the injunctive relief sought as the findings warranted.

I should reverse the decree of the court below and thereby enforce the inhibition on equity's power to issue an injunction in a case growing out of a labor dispute *except upon a hearing of both sides (with the right of cross-examination) and findings thereafter by the court on the material issues of fact involved* as I think existing law requires.

---

[1] For a well-considered and thought-provoking discussion of the subject, see address of Honorable George Wharton Pepper before the American Bar Association in 1924, 49 American Bar Association Reports 174.