Westinghouse Electric Corporation, Appellant, *v.* United Electrical, Radio and Machine Workers of America.

Argued November 17, 1955. Before STERN, C. J., STEARNE, JONES, BELL, MUSMANNO and ARNOLD, JJ.

*P. H. Strubing*, with him *Francis E. Shields, J. H. Ward Hinkson* and *Pepper, Bodine, Frick, Scheetz & Hamilton*, for appellant.

*David Cohen, David Scribner* and *Charles J. Hepburn, Jr.*, for appellees.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, November 28, 1955:

The question presented by this appeal is whether or not, in a labor dispute, mass picketing is legal unless accompanied by acts of violence, coercion or intimidation. The court below dissolved a preliminary injunction which enjoined defendants (appellees):

"(a) from preventing or attempting to prevent by mass or chain picketing, violence, intimidation or coercion, any person or persons from freely entering or leaving plaintiff's premises known as its Lester Plant, at Lester, Pennsylvania;

"(b) from having in front of or in close proximity to any entrance of plaintiff's premises at Lester, Pennsylvania, more than three pickets at any one time, such

pickets to be in motion at all times and spaced not less than 10 feet apart in a single line and to conduct themselves in such manner as not to block or interfere in any way with the use of such entrances by any person or persons desiring to enter or leave said premises on foot or by vehicle;

"(c) from hindering or obstructing in any manner ingress to or egress from plaintiff's premises by plaintiff's officers, agents, employees, representatives and others having business with plaintiff;

"(d) from seizing or holding the said premises in any manner not set forth above;

"(e) from congregating in large number near to or about said premises or the entrances thereof at any time."

The evidence establishing the existence of mass picketing, and that appellees prevented free access to appellant's plant, is uncontradicted. The reason assigned by the learned chancellor for dissolving the injunction is that appellant failed to prove ". . . *that [the] Union attempted forcibly to deny access to this plant.*"

We have read the uncontradicted testimony with care. Following the strike gate No. 1 furnished the sole means of ingress and egress. On October 17, 18 and 19, 1955, the number of pickets varied from six to ten at 6:30 a.m. to three hundred to four hundred at 8:15 a.m.; the pickets stood in a shoulder to shoulder formation, many rows deep in front of the entrance, completely obstructing and blocking the entrance. The chancellor ruled that ". . . There was no testimony indicating a testing of the situation . . . [no evidence of] a sincere attempt to enter. . .". Such ruling was obviously that there could be no seizure or holding of property within the amendment to the Labor Anti-Injunction Act unless there was proved a sincere attempt to enter the plant, which was prevented by mass picket-

ing. The court was of opinion that to establish that mass picketing was intended to be an effective obstructing or blocking of passage into and from the plant, a test should have been made by an attempt to pass through such mass · picket line. Such ruling was obviously in error and must be reversed.

This Court has decided in several cases that prevention of free access to and from an employer's property by mass picketing, even without actual or threatened force or violence, constitutes an illegal seizure prohibited by the Labor Anti-Injunction Act of June 2, 1937, P. L. 1198, amended by the Act of June 9, 1939, P. L. 302, 43 PS 206a and 206d. In *Carnegie-Illinois Steel Corp. v. United Steelworkers of America,* 353 Pa. 420, 45 A. 2d 857, while evidence existed of violence or threats of violence, Chief Justice MAXEY, in the majority opinion, clearly indicated that prevention of access by mass picketing was alone sufficient to require an injunction. In *Westinghouse Electric Corporation v. United Electrical, Radio & Machine Workers of America (CIO) Local 601,* 353 Pa. 446, 46 A. 2d 16, where there was no evidence of actual force or violence, an injunction against mass picketing was ordered. Justice STERN, now Chief Justice, stated for the Court (p. 457): ". . . The right of picketing, when free from coercion, intimidation and violence, is a right constitutionally guaranteed as one of free speech: Senn v. Tile Layers Protective Union, 301 U. S. 468, 478; Thornhill v. Alabama, 310 U. S. 88; American Federation of Labor v. Swing, 312 U. S. 321; Cafeteria Employees Union, Local 302 v. Angelos, 320 U. S. 293. But picketing to the extent to which it is designed to seize and in effect does seize and hold the employer's plant by the methods here employed does not fall within either constitutional, statutory, common law or equitable protection."

In *Wortex Mills, Inc. v. Textile Workers Union of America, C. I. O.*, 369 Pa. 359, 85 A. 2d 851, where, as here, there was mass picketing with no proof of violence, coercion, intimidation and threats, Mr. Justice BELL, speaking for the Court, said (p. 363) : ". . . mass picketing is illegal; coercion, intimidation and threats are illegal; and where these exist it can not be successfully contended that the picketing was peaceful: Westinghouse Electric Corp. v. United Electrical Workers, 353 Pa. 446, 457, 46 A. 2d 16; Kirmse v. Adler, 311 Pa. 78, 166 A. 566; Carnegie-Illinois Steel Corp. v. U. S. W. of A., 353 Pa. 420, 45 A. 2d 857."

And again in *Wortex Mills, Inc. v. Textile Workers Union of America*, 380 Pa. 3, 109 A. 2d 815, Mr. Justice BELL said (p. 7) : "The first question that arises is: Has a Court of Equity jurisdiction to enjoin *mass* picketing which is employed in an effort to organize a union? The answer is undoubtedly 'yes'. The Supreme Court of the United States and this Court have repeatedly reiterated that *mass picketing is illegal* and that *State Courts have power to restrain such picketing:* United Construction Workers v. Laburnum Construction Corp., No. 188, October Term, 1953, decided June 7, 1954 (United States Supreme Court) ; Allen-Bradley Local v. Wisconsin E. R. Board, 315 U. S. 740, 749; Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc., 312 U. S. 287; Labor Board v. Fansteel Corp., 306 U. S. 240; Wortex Mills v. Textile Workers U. of A., 369 Pa. 359, 85 A. 2d 851; Westinghouse Electric Corp. v. United Electrical, etc., 353 Pa. 446, 46 A. 2d 16; Carnegie-Illinois Steel Corp. v. U. S. W. of A., 353 Pa. 420, 45 A. 2d 857."

The court below in the present case states in the opinion: "We received the distinct impression from the testimony that the Company was more interested in impressing the Judge with the so-called illegal be-

havior of the men than in getting Supervisors into the plant; more interested in legal rights than in labor relations; more interested in breaking the morale of the men and the Union itself than in negotiating a contract."

That court should have been concerned exclusively with the legal question of whether mass picketing, unaccompanied by violence, threats and intimidation, is illegal. Where such action is adjudged illegal, the good or bad motive of an employer in insisting upon the enforcement of the legal principle is immaterial: see *Cohen v. Perrino,* 355 Pa. 455, 460, 50 A. 2d 348.

The order of the court below is reversed, and the record remanded with direction to issue an injunction enjoining and restraining defendant Union, its officers, representatives, agents and members and all other persons acting in concert with them (1) from preventing or attempting to prevent, by mass picketing, intimidation or coercion, any person or persons from entering or leaving plaintiff's plants and properties and (2) from in any other manner seizing or holding said plants and properties. Said injunction to be effective upon the filing of plaintiff's bond in the sum of $25,-000, with surety approved by the court, in manner and form required by law, and to continue until final hearing. Each party to bear its own costs.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The Lester, Delaware plant of Westinghouse Electric Corporation, the plaintiff in this lawsuit, employs 7,000 persons, 6,000 of whom are members of the United Electrical, Radio and Machine Workers of America, Local 107, the defendant here. On October 19, 1955, following the filing of a bill of complaint because of a strike which began on October 15th, the Court of Com-

mon Pleas of Delaware County issued a preliminary injunction prohibiting the defendant Union from engaging in certain types of picketing, obstructing, congregating and seizure of property. On October 28, 1955 the Court dissolved the injunction, satisfied that the facts did not justify its continuation. Upon appeal by Westinghouse, the Majority of this Court has ordered the Delaware County Court to re-issue an injunction against the Union, on the basis that the Union is guilty of mass picketing. The Majority goes further and says: "The evidence establishing the existence of mass picketing, and that appellees [the Union] prevented free access to appellant's [Westinghouse's] plant, is uncontradicted."

I take issue with this conclusion.

Not only was the charge of mass picketing denied by the Union, but the evidence aimed at that effect by Westinghouse was contradicted by some of its own witnesses. To give one illustration out of many, William K. Heimbach, Manager, Industrial Relations, Steam Division, testified that on the morning of October 17th he was approaching the plant when his progress was blocked by some hundred or a hundred and fifty men, standing shoulder to shoulder on the sidewalk." When asked by Westinghouse counsel: "And would you say it was blocked in the sense that you could not proceed further?" his answer was "I don't think so." An answer of "I don't think so" by a partisan witness, intent on showing the affirmative of a controverted point, is equivalent to an emphatic negative advanced by one entirely neutral in the premises.

The cases cited by the Majority in support of its action are authoritative of the facts therein respectively involved, but they have no application to the controversy before this Court. Before a surgeon picks up the scalpel, a qualified diagnosis must establish the

exact nature of the ailment and whether it requires operative treatment. The lower Court found that no injunctive operation was needed. The Chancellor, after hearing evidence for two days, declared: "We had an opportunity to observe and hear the witnesses of both sides and to observe the conduct of the people in the Court Room. We were not impressed by the plaintiff's witnesses; in many cases, the testimony was halting and unimpressive, conveying the impression that the testimony had to be carefully weighed, so that some hurtful testimony might not slip in. On the other hand, we were impressed by the forthright testimony and demeanor of the witnesses for the defense. At most, the plaintiff's testimony showed groups of men, variously estimated at different times from 10 to 15 up to several hundred. There was no testimony indicating a testing of the situation—no Supervisor testified to a sincere attempt to enter."

My reading of the record affirms the Chancellor's findings that the supervisors made no sincere attempt to enter the plant. In this connection it will be interesting to look at the testimony of M. B. Wilcox, Assistant Manager, Industrial Relations, Westinghouse, who testified that he experienced difficulty in entering the plant because the pickets *smiled* at him. After stating that he found 50 pickets near the plant he narrated the following: "Someone immediately said, form single file, which they formed, and we walked up and I recognized Carl Gray in the group. I said, good morning, Carl, is anybody admitted in the plant. Carl smiled and kept on walking. Of one of the other pickets I asked the same question and again there was a smile and kept on walking. We turned around and left the area."

No mass picketing, no defiant stand, no holding up of the company official—only smiles!

The Majority Opinion makes the following statement: "Following the strike gate No. 1 furnished the sole means of ingress and egress. On October 17, 18 and 19, 1955, the number of pickets varied from six to ten at 6:30 a.m. to three hundred to four hundred at 8:15 a.m.; the pickets stood in a shoulder to shoulder formation, many rows deep in front of the entrance, completely obstructing and blocking the entrance."

This statement paints a picture of a military formation reminiscent of the Macedonian phalanxes with the warriors ranged in an unbroken steel front, their shields interlocked, daring friend or foe to pass. But this colorful picture is one whose pigments could only have been squeezed from the tubes of fantasy because there is nothing in the record to support it. Robert L. Kyler, chief steward of the Union, testified that in all his experiences on picket lines, he never saw so "scraggy" a picket line as the one at the Westinghouse plant. Paul Franklin Taylor, Superintendent of Heavy Machinery at Westinghouse, described the pickets as ". . . groups of people, congregated, there was *no orderly pattern* about it; they were grouped in, some groups of three people, some as many as ten people, on the other side, on the plant side of the car tracks." *

Instead of standing "in a shoulder to shoulder formation, many rows deep," as martially described by the Majority Opinion, the pickets according to Paul Franklin Taylor, formed "an irregular circle . . . walking two abreast."

Instead of the stirring canvas of 300 to 400 pickets standing guard on three successive days, as portrayed by the Majority, the Work Manager of Westinghouse, Ray H. Timmons, found a less dramatic picture of ". . . 15 to 20 people walking around in front of the gate,

---

* Italics throughout, mine.

up against the fence. Then there was another group, off to the right, around a bench, some sitting, some standing, I suppose another dozen or so there."

Mr. Timmons wasn't even sure that all these people were striking employees. Some of them, he said, could have been non-striking Westinghouse supervisors. There were 500 supervisors at the Lester plant, many of whom were present at and around the gates of the establishment during the three days it was supposedly beleaguered.

While there was testimony with regard to workers standing close together, nowhere in the record is there justification for the statement that 300 to 400 pickets mounted guard at the entrance to the mill. Only one reference to this figure appears in the entire transcript, and it is found in the testimony of M. B. Wilcox, who said: "As I approached the trolley tracks, which is near the restaurant on the walkway, which was approximately 8:15 a.m., I noticed what *appeared to me* to be three to four hundred employees standing in solid groups at the bottom of the stairway to the viaduct entrance and further out on the walk, nearer to the trolley tracks."

When asked what he did, Wilcox replied: "I walked over to the group of employees on the other side of the trolley tracks. As we approached there someone hollered 'Tighten your line' and there were then about a hundred fifty men milling around in front of us."

Thus, in a matter of seconds, the reputed crowd of 300 to 400 had dwindled to 150. There is also no indication that this number was made up of pickets. So far as the record shows, the men could have been employees who were there for the purpose of seeking information on conditions obtaining at the plant. At the oral argument before us, one of the Union lawyers explained that there had been a Union meeting that day,

and it would not be extraordinary that some of the men should stand around after the meeting—at least temporarily. In fact, it would be the most natural thing in the world for men who suddenly found themselves deprived of employment, and consequently shorn of wages, to visit and possibly linger in the vicinity of the place where they had earned their daily bread, cherishing perhaps a little of the mystic hope that their very presence might help to bring back the pay envelope and all that it means in shelter, sustenance, comfort, and regained happiness for their families.

Moreover, looking at the whole situation realistically and without preconceived notions of improper assembly, it would not appear that a crowd of 300 to 400 would be excessive against an aggregate of 7,000 men deeply concerned over the matters in controversy. Even so, the record does not reveal any actually large concentration of strikers. Some of the company witnesses were a little amiss in the use of words denoting numbers. For example, Henry Conrad, General Foreman in the Heavy Machinery section, testified: "Joe and I, we walked over across by the restaurant, walked across the trolley line and towards the bottom of the stairs of the viaduct. It was pretty early in the morning and there were *quite a good many people* at the bottom of the stairs."

When asked how many, he replied: "I imagine about between *6 and 10 people*."

Later he explained in referring to another gathering, that by a *"big group* of people" he meant 25 or 30 people.

Jacob Polhemus, General Foreman, Heavy Machinery, testified that when he went to Gate No. 1 he was met by 10 pickets and at Gate No. 3 he was met by 15 men.

Eight Company witnesses testified in all. Several of them complained that they were asked to show passes, that they were told by strikers not to enter the company buildings, and were addressed in language not usually employed at an afternoon tea. But all this occurred in the hearty exchange which occurs in any scene of American rivalry. I have seen and heard rougher passages-at-arms between ardent partisans at a football game than I encountered in journeying through the record of what occurred at the Westinghouse plant in Lester on three strike-laden days. Furthermore, so far as violence or potential violence is concerned, the record is as destitute of incident as one would want to find in the report of a Quaker convention.

There was only one untoward episode, one where a striker purposely or accidentally touched one of the supervisors, but the striker was immediately rebuked by his fellow-workers. Henry Conrad, the official touched, himself testified to the fact that workers reproved the erring employee with: "Lay off that, don't do that."

The Union men were under strict instruction not to violate the law of good behavior. Edward Savitsky, Business Representative and member of the Executive Board of the Union, testified that the Executive Board resolved ". . . that the picketing has to be done in the right manner, there cannot be any violence, that we just cannot have any disturbance."

Further: "The people of the union were told there was a job to do, that we wanted them to try to get everyone who has to go in and out of that plant, to see our side of the story, to get their sympathies and to recognize our problem."

The transcript of the testimony reveals that with some minor exception, these precepts of the Executive

Board were adhered to by the strikers. Nor did the Company show that the Union had in any way designed or planned or adopted any policy to prevent free movement into and out of the plant. The evidence demonstrates that the workers were only endeavoring to present their side of the controversy in ways permitted by law and decisions of Federal and State Courts.*

One can easily understand the feelings of some of the Company officials and how their concern over the economic problem on their hands could sandpaper their sensibilities into abnormal receptivity of what otherwise would be quite innocuous happenings. Thus, in their eyes, ordinary gatherings became menacing, massed picketing; a little rough language reached their ears as threats; an inoffensive grouping in the environs of the plant's entrance was transformed into a seizure; and even a pleasant smile was interpreted as a scowl of banishment. This attitude, however understandable, cannot form the basis of action for a court of law. Thus it was that the learned Chancellor in the Court below, watching and studying the witnesses, sagely observed: "We received the distinct impression from the testimony that the Company was more interested in impressing the Judge with the so-called illegal behavior of the men than in getting Supervisors into the plant; more interested in legal rights than in labor relations; more interested in breaking the morale of the men and the Union itself than in negotiating a contract."

I am satisfied that the action of the Court below, in dissolving the injunction it had originally granted without hearing and on affidavits alone, was not only

---

* Labor Anti-Injunction Act, 43 P.S. 206(a) et seq., June 2, P. L. 1188 Sec. 1, et seq., *Thornhill v. Alabama*, 310 U. S. 88; *Westinghouse Electric v. United Electrical*, 353 Pa. 446, *456; Carnegie-Illinois Steel Corp. v. United Steel Workers*, 353 Pa. 420, *429*.

justified but compelled by the evidence he heard in open court. An injunction is a strait-jacket that is to be employed only when violence threatens to overcome reason and excess has overpowered proportion. An injunction improvidently issued is capable of infinite harm. It is for that reason that the Congress of the United States and the General Assembly of Pennsylvania have passed anti-injunction laws.

There are exceptions, of course, where injunctions are not only in order but imperative. When riot marches on law and order, and passion flames into tumult, a court of equity would be remiss in duty if it did not stay the ugly hand of turbulence with the strongest weapon in its formidable armory of society's defense. But to call out the armed reserves when the occasion in no way requires such drastic intervention is to upset the equilibrium of normal economic relationship and to provoke strife where none is expected or intended.

The order issued by the Majority of this Court is in my view entirely unnecessary. In some ways it is not objectionable because largely it is an injunction against sin. It enjoins seizure and violence which are in themselves punishable without injunctive prohibition. The fault in the Court's order lies in the fact that, conjoined with the opinion which precedes it, it presupposes that some of the interdicted acts have already occurred. It enjoins coercion and mass picketing on the assumption that the Union has already been guilty of such practices which, so far as the record attests, is not the case. Furthermore, it does not define mass picketing. While this term has taken on a certain meaning in recent years, it naturally varies according to the factors involved, namely, the number of the striking employees, the geographical and topographical situs of the establishment in controversy, the size and

location of the plant's entrances and exits, the traffic to be anticipated at the locus in quo, etc., etc. Of all this, there is nothing in the Majority Opinion. The lower Court is instructed to enjoin on a sea of shadows, on an ocean of obscurity and a shoreless expanse of uncertainty. It is directed to discipline phantoms and to prohibit non-existent circumstance.

Law to be effective cannot afford to be less precise than the marine turbines, atomic energy generators, and propulsion equipment manufactured and stored in the 50 buildings at the Lester plant. The property of the plaintiff corporation at Lester covers 414 acres, 93 acres of which are surrounded by fences, and accommodates 7 1/2 miles of railroad tracks. A loosely drawn injunction to cover this vast domain can lead only to confusion, misunderstanding, and potential discord.

I see no need for an injunction in this case at all. The unfortunate differences which have arisen between Westinghouse and the Union are not going to be settled in the field but at the counsel table of deliberation, moderation, and compromise. It is the American way. Both sides will need to approach the distressing impasse unembarrassed, unharassed, and unimpeded by vexing injunctions and formalistic restraints. To the extent that either side must drag chains to the table of negotiation, to that extent will freedom of discussion be hampered, and to that extent will the final adjustment be further delayed and pushed off into the misty future. In the meantime, vital wages and profits are floating on the stream of bitter contention out into the sea of irrecoverable return.

I dissent.