## USS v. United Steelworkers of America International Union

*Robert M. Talley* and *Richard Hale Pratt,* for plaintiff.

*Joseph Lurie,* for defendant.

BIEHN, *J.,* October 17, 1986 — The United Steelworkers of America International Union and its members, four local unions and their members, and various named officers of those unions have appealed to the Superior Court from an order entered October 14, 1986, granting in limited part the petition of USS, a Division of USX Corporation Fairless Works for a temporary injunction.

After considering all of the testimony presented at an October 7, 1986, hearing, we determined that defendants' actions on October 2, 1986, constituted a seizure of property which, if allowed to continue, would result in irreparable harm to plaintiff. Although plaintiff sought broad restrictions on the number of pickets and their activities at all entrances and exits to Fairless Works, the only relief justified by the evidence was to restrain defendants from preventing or attempting to prevent by mass picketing or otherwise any ingress or egress to or from the sole rail access to the plant.

The following facts were established at the hearing. On August 1, 1986, the labor agreement between plaintiff and defendants expired. No new labor agreement could be reached and negotiations came to an impasse. As a result, a labor dispute ensued at plaintiff's Fairless Works facility. In addi-

tion, members of defendant unions have engaged in lawful picketing at various gates of the Fairless Works plant.

On September 18, 1986, John Maczuzak, Fairless Works general manager, and Delbert Reinke, manager of labor relations, met with Al Lupini, president of Local Union No. 4889, to inform Mr. Lupini that it was the intention of plaintiff to load and ship hot rolled bands, a type of semi-finished steel, from the Fairless Works plant to one of its customers, USS/POSCO. It was determined that this product would be shipped by rail and therefore, plaintiff contacted the Consolidated Rail Corporation which has the sole rail access to the Fairless Works facility.

No shipments had been sent since the beginning of the labor dispute. The hot rolled bands inside the plant had all been produced prior to the labor dispute.

Lupini indicated at the September 18 meeting that any shipment loaded by plaintiff's management would cause a problem and if necessary, the union would shut the company down. The railroad cars were delivered to the plant on September 29, 1986, and between that date and October 1, 1986, they were loaded by management. The union had offered to have its members load the product in which case it would not attempt to stop the shipment. However, no agreement could be reached as to an hourly wage.

Other meetings ensued between plaintiff's management and union officials. At some point, Lupini was advised that Conrail would be removing the loaded product from the plant on October 2, 1986, between 9:00 a.m. and noon.

Prior to the arrival of the Conrail locomotive on that day, union officials made clear their intention

to stop the shipment. Videotapes of news broadcasts introduced into evidence at the hearing plainly demonstrated this fact. On September 29, 1986, and October 1, 1986, union officers voiced their plan to "stand on the railroad tracks," "get out and stop them," and "let's shut the goddamn gates down."

On October 2, 1986, between 400 and 500 pickets amassed on or near the rail line by 9:00 a.m. Again, photographs taken at the scene clearly depict the union's actions. At 9:15 a.m., the Conrail locomotive arrived and stopped 200 to 300 yards from the picketing area. Lupini walked toward the train and met Douglas Wilson, a Conrail representative, who alighted from the train.

Wilson requested that the locomotive be permitted to proceed down the tracks so that Conrail could provide service to plaintiff. Lupini responded that he could not allow that since management had loaded the railroad cars. He stated that had union members loaded the product, Conrail would be more than welcome to take the railroad cars out. Wilson returned to the train, waited for a few minutes and then directed the train to leave the scene.

Videotapes of news coverage after the confrontation revealed Lupini and other union officials making such statements as the following: "That train is not going in that steel plant . . . If they try to bring it in again, we'll have twice as many workers there next time . . . We've stopped US Steel from making shipments . . . We have kept the product in the plant, we may bring the company back to the bargaining table."

The record is not clear on what specific information Lupini possessed prior to the confrontation con-

cerning Conrail's plan to stop the train before it reached the pickets. It is defendants' position that their actions did not stop the train but rather, that Conrail honored the picket line. We do not find the question of Lupini's knowledge germane to the issue before us. It is clear from the actions and statements of both union officials and members that they had no intention of letting the train into the Fairless Works plant.

Certainly, defendants have a right to picket. "The right of picketing, when free from coercion, intimidation, and violence, is a right constitutionally guaranteed as one of free speech." *Frankel-Warwick Ltd. v. Local 274*, 334 Pa. Super. 47, 51, 482 A.2d 1073 (1984).

However, the Labor Anti-Injunction Act, 43 P.S. §206a et seq., on which defendants rely, makes it clear that no protection is afforded those employees who seize property of the employer. The act reads in part as follows:

"No court of this commonwealth shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case included within this act, except in strict conformity with the provisions of this act, nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this act. Exclusive jurisdiction and power to hear and determine all actions and suits coming under the provisions of this act, shall be vested in the courts of common pleas of the several counties of this commonwealth; provided, however, *that this act shall not apply in any case*—

"(d) Where in the course of a labor dispute as herein defined, an employee, or employees acting in concert, or a labor organization, or the members, officers, agents, or representatives of a labor organiza-

tion or anyone acting for such organization, seize, hold, damage, or destroy the plant, equipment, machinery, or other property of the employer with the intention of compelling the employer to accede to any demands, conditions, or terms of employment, or for collective bargaining. June 2, 1937, P.L. 1198, §4; June 9, 1939, P.L. 302, §1." 43 P.S. §206(d) (emphasis added).

The issue therefore is whether or not a "seizure" of plaintiff's property has taken place as that word has been interpreted by our courts in the context of a labor dispute.

In *Neshaminy Constructors Inc. v. Philadelphia, Pennsylvania Building and Construction Trades Council, AFL-CIO,* 303 Pa. Super. 420, 449 A.2d 1389 (1982), a situation was presented similar to that before this court:

"The activities of appellee's pickets were recorded by videotape over the course of three days. These tapes were entered into evidence and examined by the trial judge. The tapes, together with the recorded testimony, have also been examined by the members of this court. This evidence establishes beyond peradventure of a doubt that vehicles approaching the entrance were denied access to the site. When a vehicle approached the gate, one or more pickets engaged the driver in conversation while several others placed themselves in front of the vehicle. The latter pickets refused to move, and the vehicle was thereby denied entrance. The absence of violence, a fact noted by the trial judge, was attributable solely to the unwillingness of approaching vehicle operators to challenge physically the pickets stationed in front of their vehicles. Rather than attempt to force their way into the construction site, the drivers withdrew." Id. at 422-423 (footnote omitted).

The Superior Court clearly and concisely reiterated the law in this area, which we shall quote extensively and follow accordingly:

"The right to picket has been constitutionally guaranteed, and courts should be unyielding in their determination to protect and preserve that right. It is the voice by which working men and women assert their grievances and their rights. They should not be restricted or restrained, either directly or indirectly, from making their voices heard. However, '[f]orcibly to deny an owner of property or his agents and employees access to that property . . . is in practical and legal effect a seizure or holding of that property.' *Carnegie-Illinois Steel Corp. v. United Steelworkers of America et al.,* 353 Pa. 420, 429, 45 A.2d 857, 861 (1946). Whether accompanied by violence or not, picketing which denies access to an employer's plant or property constitutes a seizure thereof and cannot be permitted. *Wilkes-Barre Independent Co. v. Newspaper Guild, Local 120 et al.,* 455 Pa. 287, 290, 314 A.2d 251, 253 (1974); *Westinghouse Electric Corp. v. United Electrical, Radio & Machine Workers of America,* 383 Pa. 297, 300, 118 A.2d 180, 181 (1955). '[P]icketing to the extent to which it is designed to seize and in effect does seize and hold the employer's plant . . . does not fall within either constitutional, statutory, common law or equitable protection.' Id., quoting from *Westinghouse Electric Corp. v. United Electrical, Radio & Machine Workers of America (CIO) Local 601,* [353 Pa. 446, 457, 46 A.2d 16 (1946)].

"It is of no significance that pickets impede ingress and egress at only one of several entrances to the premises. '[T]he holding of even one gateway to a plant [may] constitute [ ] a seizure. . . .' *Wilkes-Barre Independent Co. v. Newspaper Guild, Local 120 et al.,* supra, 455 Pa. at 290, 314 A.2d at 253,

citing *Carnegie-Illinois Steel Corp. v. United Steelworkers of America,* supra, 353 Pa. at 430, 45 A.2d at 861. Neither is it necessary that those seeking entrance test the pickets or attempt to force their way through the pickets who are blocking the entrance and thereby risk violence and bloodshed. See *Westinghouse Electric Corp. v. United Electrical, Radio & Machine Workers of America,* supra. Similarly, it is not controlling that some who approach an entrance are more interested in obtaining an injunction than in gaining entrance. See *Westinghouse Electric Corp. v. United Electrical, Radio & Machine Workers of America, Local 107,* supra, 383 Pa. at 301-02, 118 A.2d at 182. Pickets are not entitled to select or choose the persons whom they will allow to enter the construction site; they are not entitled to impair physically, by force or threats of force, free access to the construction site by any authorized person." Id. 424-425.

The Superior Court then remanded the case for the issuance of a decree enjoining and restraining the appellee union and its members from preventing any person from entering or leaving the site in question by vehicle or on foot.

Applying the above principles to the facts before us, we find, beyond any doubt, that defendants' actions amounted to a seizure of plaintiff's property. Approximately 400 to 500 pickets blocked the passage of the Conrail locomotive. The statements made by union officials before and after the confrontation with the Conrail representative clearly demonstrate that defendants had no intention of allowing the train to enter the Fairless Works facility. It is equally clear that one of the reasons for defendants' actions was an attempt to force plaintiff to accede to their demands that members of defendant unions be permitted to load the railroad cars. An-

other reason was defendants' attempt to compel plaintiff back to the bargaining table.

The fact that lack of violence is not a determining factor is made clear in *Neshaminy Constructors*. As in that case, violence and injury were avoided here due to the unwillingness of those approaching the pickets to force their way through. Given the circumstances here, of a locomotive approaching hundreds of people, we find the actions of the Conrail representative in withdrawing and leaving the scene reasonable and consistent with our finding of a seizure.

Here, defendants denied access to the sole rail line entering plaintiff's property. The fact that other gates may have been open and clear is also not a deciding factor. To say that Conrail chose to honor the picket line is an argument we cannot accept. Conrail had no choice but to retreat or risk serious injury to hundreds of people. If we were to find no seizure in the instant case, plaintiff would be deprived of the use of its property for clearly Conrail will not attempt to propel the locomotive into the crowd.

Finally, we find that plaintiff would suffer irreparable harm if defendants' actions in seizing the premises and its contents are not enjoined.

Accordingly, a temporary injunction was issued against defendants.