652 A.2d 1286

**GIANT EAGLE MARKETS COMPANY, Appellant**

v.

**UNITED FOOD AND COMMERCIAL WORKERS UNION, LO-CAL UNION NO. 23; Carl C. Huber, Individually and as President of Local Union No. 23; Edward J. Manning, Individually and as Assistant to President of Local Union No. 23; and James R. Bono, Individually and as Secretary/Treasurer of Local Union No. 23, Appellees.**

Supreme Court of Pennsylvania.

Submitted Sept. 21, 1994.

Decided Jan. 20, 1995.

412

Bernard D. Marcus, Jane Campbell Moriarty, David B. Rodes, and Marcus & Shapira, Pittsburgh, for appellant.

Vincent Candiello, Harrisburg, for Pennsylvania Chamber of Commerce & Industry, amicus curiae.

Thomas E. Weiers, Jr., Rich, Fluke, Tishman & Rich, P.C., Pittsburgh, for Western Pennsylvania Chapter Associated Builders Contractors, Inc., amicus curiae.

Lawrence S. Coburn and Jean M. Gallagher, Pepper, Hamilton & Scheetz, Philadelphia, for Associated Builders & Contractors, Inc., Southeast Pennsylvania Chapter and Central Pennsylvania Chapter, amici curiae.

Harry R. Harmon and Thomas R. Davies, Harmon & Davies, P.C., Lancaster, for Keystone Chapter, Associated Builders & Contractors, Inc., amicus curiae.

Richard D. Gilardi, Kevin R. Lomupo, Gilardi & Cooper, and Michael J. Healey and James R. Reehl, Pittsburgh, for appellees.

Irwin W. Aronson, Handler, Gerber, Johnson & Aronson, Camp Hill, for Pennsylvania AFL–CIO, amicus curiae.

Before NIX, C.J., and FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY, CASTILLE and MONTEMURO, JJ.

## OPINION

MONTEMURO, Justice.

This is an appeal from an order of the Superior Court reversing the order of the Court of Common Pleas of Allegheny County, Civil Division, which granted an injunction limiting the number of union pickets, and enjoining unlawful conduct by those pickets at any of the retail stores in Allegheny County owned by appellant, Giant Eagle Markets Company. The issue presented is whether the Superior Court erred in holding that the trial court had no reasonable basis for issuing an injunction against appellee on the ground that the conduct of appellee's union pickets resulted in a seizure of appellant's property under the Labor Anti–Injunction Act, 43 Pa.S. § 206(d). Having reviewed the record, we find that there was ample evidence to support the trial court's action and reverse.

At 12:01 a.m. on April 21, 1991, members of appellee, United Food and Commercial Workers Union Local No. 23 went on strike and began picketing appellant's Allegheny County stores. On April 23, 1991, appellant sought injunctive relief averring that union workers were engaging in mass picketing, violence, and intimidation directed against persons seeking to do business with appellant, including those employees who were willing to cross the picket line. In addition, appellant alleged that business revenues had dropped seventy percent during the forty-eight hour period since the onset of the strike.

On the afternoon of April 23, 1991, a hearing was held on the motion for injunction. During the hearing, appellant presented the following testimony: Raymond Burgo, the executive vice president of Giant Eagle testified that the "picketing ha[d] basically taken over control of the stores." (Injunction Hearing Transcript (IHT), 4/23/91, at 7). In addition, Burgo described the inability of customers to get into the stores, the difficulty employees were having in the stores, and further testified that there had been a large number of complaints to the customer relations office by both customers and employees. I.H.T. at 8. Finally, Burgo testified that he had personally observed pickets blocking the front entrances of the stores. *Id.* at 9.

Appellant next introduced the testimony of Douglas Martin, the manager of the Giant Eagle store in Pleasant Hills. Martin testified that he had personally observed the picketing that had been going on since April 21st. According to Martin, approximately fifty to sixty pickets had been present at the store with approximately thirty of the pickets blocking the store's entrance. *Id.* at 18–19. Martin stated that as customers approached the doorway to the store, the pickets would either stand "shoulder to shoulder, a couple of lines deep, to prevent any customer from entering the store," or would "kind of swarm on the customer and surround her and form a gauntlet" thus intimidating the customer and preventing her from entering the store. *Id.* at 19. In addition, Martin stated that employees crossing the picket lines had received threats from the picketers. *Id.* at 21.

Martin also stated that in addition to standing at the front entrance, pickets were positioned at all three entrances to the parking lot, as well as the side driveway and rear dock area. *Id.* at 26. Martin testified that when a truck arrived, "the pickets would immediately start a mad rush throughout the parking lot and swarm on the truck and surround it, stop it and turn it away." *Id.* at 21. Martin also claimed that in two sections of the store itself, he discovered two rodent traps which had been hidden and set to go off. *Id.* at 33. Martin

stated that the police had been called, but were unable to keep the pickets from swarming on the customers and the deliveries. *Id.* at 22.

Following Martin's testimony, Dale Kane, a pizza delivery person who had delivered pizza to the Giant Eagle in Village Square during the strike, appeared as appellant's next witness. Mr. Kane testified that after delivering pizza on April 22nd, he returned to his vehicle and began to exit the parking lot of the store. Kane stated that as he was looking to his right in an attempt to make a left hand turn, he heard something hit the truck and saw a twelve inch crack in the vehicle's windshield. *Id.* at 38. Kane testified that he had been afraid to get out of the vehicle, and instead drove back to the pizza store to call the police. According to Kane, his company no longer permitted its drivers to deliver pizza to Giant Eagle because of the incident. *Id.*

Appellant's fourth witness was David Trunzo, the manager of the Giant Eagle at Shakespeare street in Pittsburgh. Trunzo testified that he had observed fifty to sixty pickets blocking the entrance to the store. *Id.* at 45–46. A videotape confirmed this fact, and revealed a comment by a picketer about "running somebody over" who was trying to load groceries. *Id.* at 48. Trunzo stated that the store normally had between 20–23 thousand customers a week, but that the picket's blockade of the entrance had resulted in those numbers dwindling to 1,500 per day.

Trunzo further testified that there were also pickets at the sides of the store entrances, in the middle of the median strip on Penn Avenue, and on the Shady Avenue and busway entrances. *Id.* at 49. Trunzo claimed that these pickets were blocking the cars or deliveries from coming in those entrances. *Id.* Trunzo also stated that he had witnessed harassment and intimidation of employees, as well as the following statement to a customer: "We know you, girl. I know where you live." In addition, Trunzo alleged that a physical confrontation was threatened between the pickets and a customer who became upset with a picket, and stated that her husband would be back to see the picket. *Id.* at 49–50.

Additionally, a bomb threat was received at the same time the pickets raced away. *Id.* at 50. The police were called and searched the store.

Appellant next called Melvin Schreckengost, an employee of Allied Security Company, who had been assigned to the Giant Eagle in Monroeville on the morning of April 23, 1991. He testified that he had seen a woman letting air out of the tires of a white van that was making a delivery to Giant Eagle, and that he later found a board with nails in it in the area where trucks back in and pull out. *Id.* at 66–67.

Appellant's sixth witness, Charles Sholhead, testified that he worked at the Giant Eagle on the South Side of Pittsburgh as the store manager. Sholhead stated that he observed between twenty-five and fifty pickets positioning themselves in front of the store entrance, blocking the front of the store, sidewalk, parcel area and exits. *Id.* at 74. Sholhead also observed pickets standing in the handicapped ramps and in the fire lane. Sholhead testified that he himself had been sworn at by the pickets, and that employees of the store were harassed and taunted as they went in and out of the store. *Id.* at 77. In addition, he stated that customers, many of whom were elderly, were forced to walk through twenty-five to fifty pickets, whom he observed taunting people. *Id.* at 80.

Appellant next presented the testimony of Arlene Malky, who shopped at the Giant Eagle in Fox Chapel, and was part of the "Apples for the Student" staff at Giant Eagle's corporate office. Ms. Malky testified that on the first morning of the strike, at about 9:45 a.m., there were approximately forty to fifty pickets. *Id.* at 98. As she came out of the store with her groceries, she was told "We'll remember you lady, the next time you are here." *Id.* at 99. Ms. Malky testified that:

I felt very threatened, because even in going into the store, I felt quite intimidated by the large group of people, and after that remark, I really did feel scared.

*Id.* at 99.

Vincent Kuhn, an assistant manager at the Giant Eagle in West View, testified that as one of the employees who was a

member of Local 23 attempted to leave the store, the strikers began chanting "Scab," and the employee seemed very intimidated and looked frightened. *Id.* at 105. Kuhn stated that the employee was asked if she wanted assistance, and she said "yes." She was then escorted to the bus by two security guards. While she was being escorted, the pickets continued to call her a "scab, slut, and a whore." *Id.* at 106.

The ninth witness presented by appellant was Michael Hammond, the manager of the West View Giant Eagle. Hammond had observed at least forty-five pickets at the front entrance of the store, impeding the customers' ingress and egress. *Id.* at 112. Hammond stated that the pickets were crossing both sides of the entrance, and were taunting, booing, or harassing customers as they came in and out of the store. *Id.* In addition, the pickets were standing in the cab and fire lanes. *Id.* at 113. According to Hammond, many of the senior citizens arriving on the Access bus were not only unable to buy groceries, but were also unable to purchase their prescriptions. This was due to the fact that the bus driver had taken all the senior citizens on the bus to another location when a striker approached and asked the driver not to patronize the store. *Id.* at 113. Hammond also observed the pickets making obscene gestures at customers and cashiers. *Id.* at 116.

Appellant's final witness was Lori Johnson, an employee of the McMurray Giant Eagle. Although she was a member of Local 23, Ms. Johnson testified that she had gone to work during the strike. *Id.* at 126. Upon returning from work, Ms. Johnson found the following message on her answering machine: "I have a message for you. We are going to get you. Scab. Bitch. Scab." Then a number of people yelled "scab, scab, scab" and "you are going to fry." *Id.* at 126–127. Ms. Johnson identified the solo voice as a co-worker.

In response to this testimony, appellee introduced five witnesses who painted a dramatically different picture of the scene on the picket line.

Gary K. Best, the Director of Representatives for the United Food and Commercial Workers Union Local 23, testified that he was the strike coordinator responsible for sustaining and maintaining a well-run picket line. *Id.* at 137. Best stated that at the commencement of the strike he had given the police a letter identifying who the pickets were, what they were doing, how they intended to do it, and who to contact on a twenty-four hour basis if there were any problems. *Id.* at 140. Best, however, had received no calls from the police. Rather, the only source of trouble had come from several drunk and disorderly individuals who were harassing the pickets. These individuals, however, were not affiliated with the union. *Id.* at 142.

Best further explained that a store coordinator, a full-time representative of the union, was present at each site to oversee the picket line along with from three to seven picket captains. *Id.* at 137. Best testified that he had specifically instructed these individuals to picket entrances used by customers, but not to block any entrance for pedestrians on foot or any entrance for automobiles driving into the store parking lot. According to Best, the union had received no complaints from members of the public or members of Giant Eagle Management that they were unable to get into the store. *Id.* at 144.

Mary Ann Zerngibel testified that she had been an employee at the South Side Giant Eagle for twelve years, and had been picketing in front of the store on the previous day. Ms. Zerngibel first stated that on that day she had asked the store manager, Charles Sholhead, who had been taking pictures, whether he was taking pictures of her car and that Mr. Sholhead had misinterpreted this comment as a threat against his own automobile.

According to Zerngibel, between twenty-five and thirty pickets had been standing in front of the store. However, only eight of these pickets were within twenty yards of the store entrance. Zerngibel stated that the remainder of the pickets were scattered throughout the parking lot at the two front entrances to the store, the four entrances to the parking

lot, in back and front of the store and along the sidewalk in the porch area of the store. *Id.* at 154–155, 160.

Ms. Zerngibel testified that she had never observed the store's entrance being blocked, had never seen customers being physically prevented from going into stores, and had never seen a car unable to enter the parking lot due to pickets blocking the entrances. *Id.* at 155. Furthermore, she noted that pickets could no longer stand in the area immediately in front of the store since the store's shopping carts had been moved to that location. *Id.* at 156.

Appellees' third witness was Steve Winston, an employee at store 72 in the Waterworks Mall in Fox Chapel who had been picketing in front of that store with approximately twenty other people. Winston stated that they were standing close to the doors but had not blocked entry, and, in fact, could not do so since Giant Eagle had hired Allied Security guards who asked the pickets to move if they began to block the doors. *Id.* at 164.

Winston testified that when a customer approached the store, the pickets would ask them not to cross the picket line. If the customer ignored them the pickets said nothing. Winston did note that some customers chose to honor the picket line and did not enter the store. However, according to Winston, no customers were threatened or prevented from entering the store. *Id.* at 165.

Paul Schempp of the Pleasant Hills store testified that he had picketed in front of the store from 12:30 p.m. to 9:30 p.m. on April 22, 1991, and from 8 a.m. to 12:30 p.m. on the day of the hearing (April 23, 1991). Schempp stated that on April 22nd, pickets were stationed in six areas, with three to four and as few as two people in areas away from the store doors, and only one to two people at the back of the store near the delivery area. *Id.* at 168. Schempp also stated that one grocery truck driver refused to cross the picket line, but that a scab truck driver had subsequently driven the truck across. *Id.* at 169.

Schempp testified that on April 23rd, twelve to thirteen people had been picketing at the store's front entrance but that they had not blocked the entrance. *Id.* at 170–171. Rather, the pickets stood to the side of the entrance and merely asked customers not to patronize the store. *Id.*

Schempp also claimed that no customers or employees crossing the picket line had been threatened. *Id.* at 172. Schempp did note, however, that the guards and managers had occasionally blocked the entrance while watching the pickets. *Id.* at 173.

Appellee's final witness was Paul Brophy, a business representative of the United Food and Commercial Workers Union, Local 23, who had been assigned the task of supervising the picket line at Giant Eagle 61 on Pittsburgh's South Side. Mr. Brophy had begun the picket line at 12:01 a.m. on April 21, 1991, and had remained there until 7:30 p.m. on April 22, 1991. Brophy testified that there were approximately thirteen to fourteen people in the storefront area and only two to three people in front of the doors. He stated that he had been back and forth between the areas in which pickets were standing, had not seen any customer being physically prevented from leaving the store or being threatened, and that if he had seen such conduct he would have ordered the pickets to get back on the grass near the entrance. *Id.* at 180–183. Brophy likewise stated that some trucks arriving at the store had not unloaded after the drivers expressed solidarity with the Teamsters, and would not cross a picket line, but that these drivers had not been threatened. *Id.* at 186–187.

After hearing this testimony, the trial court made the following findings of fact:

(a) Defendants, United Food and Commercial Workers Union, local No. 23, Carl C. Huber, Individually and as President of Local Union No. 23; Edward J. Manning, Individually and as Assistant to the President of Local Union No. 23; and James R. Bono, Individually and as Secretary/treasurer of Local Union No. 23, have organized, participated in, or aided and abetted mass picketing at the premises of

Plaintiff; and sundry acts of violence and intimidation inflicted upon customers, suppliers, and employees of Plaintiff so as to constitute a seizure of said premises;

(b) such mass picketing and violence and intimidation will continue unless restrained;

(c) Plaintiff will suffer substantial and irreparable injury unless the requested Preliminary Injunction is granted;

(d) greater injury will be inflicted upon Plaintiff by denial of such relief than will be inflicted upon Defendants by the granting thereof;

(e) Plaintiff has no adequate remedy at law;

(f) the public interest is served by the entry of this order (Order of Court, 4/23/94). Based on these findings of fact the trial court issued an injunction ordering the pickets to be peaceful and lawful in nature, restricting the number of pickets at the entrances of all appellant's stores, mandating the proper spacing and location of those pickets, and enjoining appellees from preventing persons having business with appellant from entering or leaving the premises. On June 2, 1991, the labor dispute was settled and the strike was ended voluntarily.

Although the strike itself had ended, appellee still appealed the trial court's decision to grant the injunction because under 43 Pa.S. § 206q, it was entitled to reimbursement for reasonable costs and attorneys fees if the injunction had been improperly granted.[1] The trial court, however, rejected the appeal on the grounds that the issue had been rendered moot when the strike ended.

Appellee then appealed to the Superior Court which subsequently found the claim to be cognizable and determined that the trial court had erred in granting the injunction, and remanded the case for a determination of an award of attorney fees and reasonable costs and expenses incurred by appellees

---

1. 43 Pa.S. § 206q provides as follows:

"Upon denial by the court of any injunctive relief sought in an action involving or growing out of a labor dispute, the court shall order the complainant to pay reasonable costs and expenses of defending the suit and a reasonable counsel fee."

in defending the suit. Appellant now appeals from this decision.

Initially we note that in addition to challenging the merits of the Superior Court's holding, appellant also contends that the question of the propriety of the injunction in this case is now moot because the strike which was subject of the injunction has now ended. Where a party has a legally cognizable interest in the outcome of an issue of a case, that case is not moot. *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). Here, although the strike has been settled, the question of attorney fees still remains because under 43 Pa.S. § 206q appellee is clearly entitled to such recovery if appellant's request for an injunction should have been denied. The Superior Court, therefore, was correct in determining that the end of the strike giving rise to this case has not rendered the matter moot.

We now turn to the principle issue before us, namely, whether the Superior Court erred in determining that an injunction should not have been granted. It is well established that the standard of review for granting or denying a preliminary injunction requires an appellate court "only to determine if there were any apparently reasonable grounds for the lower court's action." *Valley Forge Historical Society v. Washington Memorial Chapel,* 493 Pa. 491, 500, 426 A.2d 1123, 1128 (1981). Examination of the record herein reveals that reasonable grounds existed for the lower court's action. Thus, the trial court's order granting an injunction should have been affirmed.

Labor picketing, as long as it is not coercive, intimidating, or violent, is recognized as a protected form of assembly and free speech by both the United States and Pennsylvania Constitutions. *See* U.S. Const.Amend. I and Pa.Const. Art. I, § 7. In order to preserve the delicate balance struck between the union's right to assemble and the company's ability to do business and bargain with the union in a lawful way, the Pennsylvania Legislature enacted the Labor Anti–Injunction Act (Act), 43 Pa.S. §§ 206a–r.

Under Section 206d of the Act, the courts of this Commonwealth are generally prohibited from issuing injunctions or restraining orders in cases involving labor disputes. Section 206d, however, does permit a court to issue an injunction in those cases in which striking employees "seize" an employer's property. As it states,

No court of this Commonwealth shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case included within this act, except in strict conformity with the provisions of this act. [sic] Provided, however, that this act shall not apply in any case ... (d) Where in the course of a labor dispute as herein defined, an employee, or employees acting in concert, or a labor organization ... seize, hold, damage, or destroy the plant, equipment, machinery, or other property of the employer with the intention of compelling the employer to accede to any demands, conditions, or terms of employment, or for collective bargaining.

43 Pa.S. § 206d.

We have previously held on numerous occasions that mass picketing constitutes a seizure for the purposes of Section 206d when it forcibly denies an owner of property or his agents and employees free access to that property. *See, Wilkes–Barre Independent Co. v. Newspaper Guild,* 455 Pa. 287, 314 A.2d 251 (1974); *Westinghouse Electric Corp. v. United Electrical Workers (Westinghouse I),* 353 Pa. 446, 46 A.2d 16 (1946); *Westinghouse Electric Corp. v. United Electrical Radio & Machine Workers of America (Westinghouse II),* 383 Pa. 297, 118 A.2d 180 (1955); *Carnegie–Illinois Steel Corp. v. United Steelworkers,* 353 Pa. 420, 45 A.2d 857 (1946); *Wortex Mills v. Textile Workers Union,* 369 Pa. 359, 85 A.2d 851 (1952); *Philadelphia Minit–Man Car Wash v. Bldg. & C.T.C.,* 411 Pa. 585, 192 A.2d 378 (1963).

Appellee initially argues that even if its pickets did deny access to appellant's property in the instant case, such action does not constitute a seizure under 206d since it was not part of an expressly declared union policy to prevent ingress or egress. In support of this theory, appellee cites the language

of our holding in *Westinghouse I*, 353 Pa. 446, 46 A.2d 16, in which we stated,

> We do not mean to be understood as ruling that any particular number of isolated instances of the application of force, violence or intimidation to prevent persons from entering an employer's plant or factory necessarily amounts in legal effect to a seizure and holding of property. But when, as here, such occurrences are for the purpose of implementing an expressly declared intent or policy to prevent such ingress and egress there is a seizure and holding within the meaning of the Act ...

*Id.* at 456, 46 A.2d at 21.

This argument misconstrues the standard annunciated above which focuses on the effect of mass picketing in order to determine whether a seizure has occurred, not whether the picketing was carried out with the express intent of bringing about the seizure. We agree with appellee that isolated instances of the application of force or intimidation do not constitute a seizure. This, however, is due to their sporadic nature rather than to the lack of sanction by the pickets' labor union. However, when pickets begin a consistent pattern of subjecting customers and employees to such acts, a seizure occurs regardless of whether the acts are committed in furtherance of an express union policy or, indeed, even if they are committed against the orders of the union representatives. Thus, we turn to the question of whether the trial court had reasonable grounds to conclude that the actions of appellee's pickets had the effect of denying appellant and its agents and employees free access to appellant's property.

The testimony presented by appellant regarding the blocking of entrances, swarming around customers, and other acts of terror and intimidation provided the trial court with ample evidence upon which it could reasonably conclude that the picketing in this case denied appellant's customers and employees free access to appellant's property and thus constituted a "seizure" warranting injunctive relief. Hence, under the standard articulated in *Valley Forge*, 493 Pa. at 500, 426 A.2d

at 1128, the trial court's decision to grant an injunction should have been affirmed.

The Superior Court improperly reweighed the evidence de novo and reversed the trial court's decision. In doing so it relied heavily on the fact that some of those who testified at the hearing had actually gained entrance to the premises. In light of this testimony, the Superior Court reasoned that no seizure could be found to have occurred because access to appellant's property had not been totally denied. Under such reasoning, no seizure would occur so long as even one customer gains access, despite any affronts the customer may have been forced to weather in attempting to enter.

■ We decline to adopt such a view so restrictive as to permit a finding of seizure only in the most extreme situations. Rather, we hold that mass picketing constitutes a "seizure" under Section 206d when it ceases to perform its lawful purpose of placing the public on notice that a strike is underway, and instead becomes a means of influencing labor negotiations through harassment and intimidation. The trial court possessed a reasonable ground to believe this had occurred. Thus, its decision should have been affirmed.

The order of the Superior Court is reversed and the trial court's order granting a preliminary injunction is reinstated.

CAPPY, J., files a concurring opinion in which CASTILLE, J., joins.

MONTEMURO, J., is sitting by designation.

CAPPY, Justice, concurring.

I join the well-reasoned opinion authored by Mr. Justice Montemuro in this matter. However, I write separately to emphasize my strong belief that the opinion in no manner alters the established law of this Commonwealth that the restrictive remedy of injunction is warranted only where there exists reasonable grounds for such action. Thus, the decision of the lower court should not be viewed as action designed to thwart the right to strike absent a reasonable basis.

The right to strike is unquestionably a matter of paramount concern entitled to the utmost protection, which should not be infringed absent sufficient credible evidence establishing a reasonable basis for restriction. Where the trial court finds such evidence to be credible and where the trial court then issues an injunction which orders the picketers to be peaceful and lawful, and in furtherance thereof, reasonably restricts their right to picket in terms of number, spacing and location, an appellate court reviewing such trial court's actions is constrained to conclude that there were "reasonable grounds for the lower court's action." *Valley Forge Historical Society v. Washington Memorial Chapel,* 493 Pa. 491, 500, 426 A.2d 1123, 1128 (1981) (setting forth the standard of appellate review of an order granting or denying a preliminary injunction).

Here, as clearly described by Justice Montemuro, this standard was satisfied by overwhelming evidence of violence and intimidation-based "seizure" inflicting substantial and irreparable injury upon Appellant, which the trial court found to be credible. Furthermore, the degree of remedy fashioned by the trial court was reasonably calculated to eliminate the harm being suffered by Appellant while preserving, as much as possible, Appellees' right to strike. Under these circumstances, there is no basis upon which an appellate court may reverse the decision of the trial court.

CASTILLE, J., joins this concurring opinion.