J-A09034-15

2015 PA Super 257

| TURNER CONSTRUCTION, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| PLUMBERS LOCAL 690 AND MICHAEL BRADLEY AND STEAMFITTERS LOCAL 420 AND ANTHONY GALLAGHER AND SPRINKLER FITTERS LOCAL 692 AND WAYNE MILLER AND INTERNATIONAL ASSOCIATION OF HEAT AND FROST INSULATORS AND ALLIED WORKERS LOCAL 14 AND STEPHEN F. PETTIT AND JOHN DOE | : : : : : : : : : | |
| | : | |
| APPEAL OF: PLUMBERS LOCAL 690 AND MICHAEL BRADLEY | : : | No. 2421 EDA 2014 |

Appeal from the Order entered July 18, 2014,
Court of Common Pleas, Montgomery County,
Civil Division at No. 2014-08797

---

| TURNER CONSTRUCTION, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| PLUMBERS LOCAL 690 AND MICHAEL BRADLEY AND STEAMFITTERS LOCAL 420 AND ANTHONY GALLAGHER AND SPRINKLER FITTERS LOCAL 692 AND WAYNE MILLER AND INTERNATIONAL ASSOCIATION OF HEAT AND FROST INSULATORS AND ALLIED WORKERS LOCAL 14 AND STEPHEN F. PETTIT AND JOHN DOE | : : : : : : : : : | |
| | : | |
| APPEAL OF: SPRINKLER FITTERS LOCAL 692 AND WAYNE MILLER | : : | No. 2422 EDA 2014 |

Appeal from the Order entered July 18, 2014,
Court of Common Pleas, Montgomery County,
Civil Division at No. 2014-08797

J-A09034-15

| | | |
|---|---|---|
| TURNER CONSTRUCTION, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| PLUMBERS LOCAL 690 AND MICHAEL | : | |
| BRADLEY AND STEAMFITTERS LOCAL | : | |
| 420 AND ANTHONY GALLAGHER AND | : | |
| SPRINKLER FITTERS LOCAL 692 AND | : | |
| WAYNE MILLER AND INTERNATIONAL | : | |
| ASSOCIATION OF HEAT AND FROST | : | |
| INSULATORS AND ALLIED WORKERS, | : | |
| LOCAL 14 AND STEPHEN F. PETTIT | : | |
| AND JOHN DOE | : | |
| | : | |
| APPEAL OF: INTERNATIONAL | : | |
| ASSOCIATION OF HEAT AND FROST | : | |
| INSULATORS AND ALLIED WORKERS, | : | |
| LOCAL 14 AND STEPHEN F. PETTIT | : | No. 2574 EDA 2014 |

Appeal from the Order entered July 18, 2014,
Court of Common Pleas, Montgomery County,
Civil Division at No. 2014-08797

BEFORE:  BOWES, DONOHUE and LAZARUS, JJ.

DISSENTING OPINION BY DONOHUE, J.:　　　　**FILED DECEMBER 14, 2015**

I disagree with the learned Majority that Plumbers Local 690 ("Local 690") was properly included as a named defendant in the July 18, 2014 preliminary injunction (the "July Injunction").  There is no evidence that Local 690 engaged in any unlawful protests after April 21, 2014 or that other union groups that picketed at the CHOP construction site between April 22 and July 9, 2014 did so at Local 690's behest or as its sympathizers.  I further disagree that the evidence presented concerning the July 9, 2014 protest removed the case from the ambit of the Labor Anti-Injunction Act

- 2 -

("the LAIA") or that the issuance of the July Injunction was proper. My reasoning follows.

First, in my view, Local 690 was not properly included as a named party in the July Injunction. *See* Maj. Op. at 17-20. It is undisputed that on April 21, 2014, members of Local 690 gathered at the construction site, protesting the failure of the nonunion contractor working there, Worth & Company ("Worth"), to observe "wages and standards." Petition for a Special Injunction and Preliminary Injunction, 4/21/14, at 19 & Exhibit 1. The following day, Local 690 consented to the entry of a special injunction (the "April Injunction"), which enjoined Local 690, "together with their representatives, agents, servants, sympathizers, members and all others acting on their behalf or in concert with them," from "[p]reventing or attempting to prevent by blocking, obstructing, mass picketing, or coercion in any form" people from entering the construction site. April Injunction, 4/22/14, ¶ 2. The April Injunction further limited Local 690 and the other unspecified entities to having five pickets present at the site's entrances, exits and driveways, and required all other protesters to be twenty-five feet away. This injunction also compelled Local 690 to "make every reasonable effort to cause their agents, representatives, members and those acting in concert with them, to comply with the dictates of this Order." *Id.*, ¶¶ 3-4.

In the months that followed the entry of the April Injunction, several other trade unions began picketing at the construction site, while the

number of pickets present from Local 690 decreased. Petition for a Special Injunction and Preliminary Injunction, 7/9/14, at 13. On May 12, 2014, there was a protest at the construction site, which included representatives from Steamfitters Local 420 ("Local 420"), Sprinkler Fitters Local 692 ("Local 692"), International Association of Heat and Frost Insulators and Allied Workers Local 14 ("Local 14") and Sheetmetal Workers Local 19 ("Local 19"). N.T., 7/14/14, at 26-28. On that date, there were reportedly more pickets at the entrances than permitted by the April Injunction and an incident occurred involving a member of Local 14 interfering with a delivery to the construction site. *Id.* There is nothing in the record to suggest that any member of Local 690 was present, that the picketers from these other trade unions were acting "in concert with" or "on behalf of" Local 690, or the precise message being communicated by the protesters at the May 12 protest.

In or around June of 2014, members of Local 19 reportedly "began manning the picket line almost exclusively."[1] *Id.* During this time, Local 19 allegedly had "more than the permitted number of picketers" at one of the construction site's entrances, and these picketers threatened, harassed and blocked Worth's employees and its suppliers at one of the entrances. *Id.*

---

[1] Although Local 19 was originally named as a party in Turner's second petition for a special injunction, at the beginning of the hearing thereon, Turner orally moved to remove Local 19 as a named defendant in the matter. *See* N.T., 7/14/14, at 4.

Once again, there is nothing in the record to suggest that any of these prohibited actions were taken by members of Local 690, at Local 690's direction or on its behalf, or the message being communicated through Local 19's protests.

On July 9, 2014, members of Local 420, Local 692, Local 14, and Local 19 again held an organized protest at the construction site. *Id.* at 10-12. There was evidence presented regarding the basis for this protest – these groups generally protested Turner's use of nonunion labor – which differed from Local 690's April 21, 2014 opposition to Worth's failure to abide by labor and wage standards. Petition for a Special Injunction and Preliminary Injunction, 7/9/14, at 19 & Exhibit 1; N.T., 7/14/14, at 4. Again, there was no evidence presented that a single member of Local 690 participated in the July 9 protest, that the picketers present were "representatives, agents, servants, [or] sympathizers" of Local 690, or that the members of the other trade unions present were acting "on their behalf or in concert with" Local 690. To the contrary, John D. Ricketts, Jr. ("Ricketts"), a project manager and project engineer for Turner at the construction site, admitted in the affidavit appended to Turner's amended petition that he "was not able to determine whether any of the picketers [on July 9] were from Plumbers Local 690." Petition for a Special Injunction and Preliminary Injunction, 7/9/14, at 15.

There is no evidentiary support for the Majority's contention that the other trade unions involved in the protest were "working in concert" with Local 690, that this was "a public display of support for Plumbers Local 690 by its sympathizers," or that the protest was a showing of "inter-trade solidarity among Appellants to rally against Turner in derogation of the [April] injunction." Maj. Op. at 18-19. If anything, as evidenced by the differing messages communicated through the April 21 and July 9 protests, the record reflects that these groups were protesting on their own accord. Local 690's express focus was Worth's failure to observe wage and safety standards, whereas the focus of the protest on July 9 was Turner's failure to hire all union labor.[2] The Majority confuses Local 690's specific interest with

---

[2] The learned Majority contends that there was no difference between the messages communicated during the protest by Local 690 on April 21 and by the other union groups on July 9. *See* Maj. Op. at 18 n.13. In so concluding, the Majority misstates the basis for Local 690's April 21 protest. Local 690 was not objecting to Worth's failure to abide by "the union standard for wages, conditions, and benefits." *Id.* Local 690 opposed Worth's failure to observe "wages **and** standards." Petition for a Special Injunction and Preliminary Injunction, 7/9/14, at Exhibit 1 (emphasis added). "Standards" refer to training and governmental safety standards, as evidenced by Local 690's message to the public that "Worth Contractors is destroying building industry standards." *Id.* (capitalization omitted). Further, the certified record on appeal does support the Majority's statement that Local 690 was necessarily protesting Worth's failure to pay its workers union-level wages, as opposed to its failure to pay the government-set wages. The record does not conclusively indicate what aspect of Worth's "wages" Local 690 opposed.

Moreover, the April 21 protest was not "a picket against Turner and Worth," as the Majority suggests. *Id.* To the contrary, the April 21 protest did not implicate Turner in any respect, but was limited to Local 690's disagreement

the more general interest that all labor unions have in advocating for the use of organized labor.[3] *See, e.g.,* http://www.aflcio.org/index.php/Learn-About-Unions/What-Unions-Do ("Unions are about a simple proposition: By joining together, working women and men … negotiate a contract with their employer for things like a fair and safe workplace …. They have a voice in

---

with Worth and was directed solely at Worth based upon its failure to observe "wages and standards." *See* Petition for a Special Injunction and Preliminary Injunction, 7/9/14, at Exhibit 1; *see also* Verified Complaint in Equity, 4/21/14, ¶ 7 (describing the April 21 demonstration as "members of Local 690 engaged in picketing actions **to protest a dispute with a third-party company** performing plumbing work at the [c]onstruction [s]ite") (emphasis added).

[3] Similarly, the Majority states that Local 690 "initiated the ongoing quarrel with Turner[.]" Maj. Op. at 17. This statement ignores that from the perspective of all organized labor, Turner was the one that "initiated the quarrel" by failing to hire union labor to complete all aspects of the job in question.

Contrary to the Majority's belief, there is nothing "unintentional" about my acknowledgment of the unions' shared general interest. *See id.* at 18 n.13. However, this does not mean, as the Majority contends, that the messages communicated by Local 690 on April 21 and the other union groups on July 9 were "one and the same." *See id.* Local 690, like all union groups, had an interest in Turner hiring organized labor. However, it also had an interest in an employer protecting workers and adhering to governmentally established safety standards, which, as stated above, was the specific basis of the April 21 protest. *See supra*, n.2.

Moreover, simply because all unions have an interest in promoting the use of organized labor does not mean that the union groups that conducted the July 9 protest did so at Local 690's behest or as its sympathizers. The other union groups had their own interest in protesting Turner's hiring decisions. Without more than this shared general interest between Local 690 and the other union groups, the evidence was insufficient to tie Local 690 to the July 9 protest.

how their jobs get done, creating a more stable, productive workforce that provides better services and products.") (Last visited 9/22/15).

The trial court found that Local 690 failed to abide by the April Injunction. Thus, by entering the July Injunction against Local 690, the trial court implicitly found Local 690 in contempt of the April Injunction. *See Capital Bakers, Inc. v. Local Union No. 464 of Bakery & Confectionary Workers Int'l Union (AFL-CIO) of Am.*, 422 A.2d 521, 524-25 (Pa. Super. 1980) (stating that a union group's violation of an injunction related to its protesting activities constitutes civil contempt). A finding of civil contempt requires, at the very least, proof that the party against whom the order is entered committed some act in violation of the trial court's original order. *See Habjan v. Habjan*, 73 A.3d 630, 637 (Pa. Super. 2013) (identifying the elements of civil contempt).

Turner had the burden of proof and it failed to present any evidence, let alone sufficient evidence, to establish that Local 690 had any involvement in the July 9 protest. *See Fitzpatrick v. Natter*, 961 A.2d 1229, 1241-42 (Pa. 2008) ("As a general matter, a party bringing a civil action must prove, by direct or circumstantial evidence, facts by which the trier of fact can reasonably draw the inference urged by the plaintiff. … Viewed as a whole, the 'evidentiary threads' must be sufficient to lift the contention out of the realm of speculation."). As such, I would vacate the July Injunction as it relates to Local 690 and its named member, Michael Bradley.

I now turn to the issuance of the July Injunction as a whole. The LAIA provides, in pertinent part:

> No court of this Commonwealth shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case included within this act, except in strict conformity with the provisions of this act, nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this act. Exclusive jurisdiction and power to hear and determine all actions and suits coming under the provisions of this act, shall be vested in the courts of common pleas of the several counties of this Commonwealth: Provided, however, That this act shall not apply in any case—
>
> \* \* \*
>
> (d) Where in the course of a labor dispute as herein defined, an employe, or employes acting in concert, or a labor organization, or the members, officers, agents, or representatives of a labor organization or anyone acting for such organization, seize, hold, damage, or destroy the plant, equipment, machinery, or other property of the employer with the intention of compelling the employer to accede to any demands, conditions, or terms of employment, or for collective bargaining.

43 P.S. § 206d(d).

Thus, pursuant to section 206d(d), there must be a confluence of three elements to remove a case from the ambit of the LAIA: (1) specified individuals seize, hold, damage or destroy tangible or real property of the

employer (2) during the course of a labor dispute[4] (3) with the intent to compel the employer to agree to demands, conditions or terms of employment, or for purposes of collective bargaining. The Majority addresses only the first two elements, concluding that on July 9, 2014, the union groups seized[5] Turner's property during the course of a labor dispute,

---

[4] "The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment or concerning employment relations or any other controversy arising out of the respective interests of employer and employe, regardless of whether or not the disputants stand in the proximate relation of employer and employe, and regardless of whether or not the employes are on strike with the employer." 43 P.S. 206c(c).

[5] Well established case law from our Supreme Court states that a seizure occurs when mass picketing "forcibly den[ies] an owner of property or his agents and employees access to that property[.]" *Giant Eagle Markets Co. v. United Food & Commercial Workers Union, Local No. 23*, 652 A.2d 1286, 1292 (Pa. 1995); *Westinghouse Elec. Corp. v. United Elec., Radio & Mach. Workers of Am. (CIO) Local 601*, 46 A.2d 16, 21 (Pa. 1946); *Carnegie-Illinois Steel Corp. v. United Steelworkers of Am. (CIO)*, 45 A.2d 857, 861 (Pa. 1946). It is unnecessary that the picketing block all access to the property; "[t]he holding or seizure of even one gateway" is enough to constitute a seizure of the entire property. *Carnegie-Illinois Steel Corp.*, 45 A.2d at 861. "[P]revention of free access to and from an employer's property by mass picketing, even without actual or threatened force or violence, constitutes an illegal seizure[.]" *Westinghouse Elec. Corp. v. United Elec., Radio & Mach. Workers of Am.*, 118 A.2d 180, 181 (Pa. 1955).

The record reflects that on July 9, 2014, picketers gathered at both entrances to the construction site and along the sidewalk in between the entrances. **See** Turner's Exhibit C. At its height, 181 protesters were present on site. N.T., 7/14/14, at 11. The protesters marched in a circular fashion, blocking all access to "Gate A" which was "the neutral gate," and "Gate B" which was the "primary gate for the nonunion trades to enter in and out of." **Id.** at 12, 16; Turner's Exhibit C. Ricketts testified that the

and finding that the appellants waived review of the trial court's failure to consider the intent element by not raising the argument on appeal. *See* Maj. Op. at 25-28. My review of the briefs filed in this appeal reveals that, although not extensively argued, both Local 690 and Local 692 rely, in part, upon *Solvent Machinery & Filter Systems, Inc. v. Teamsters Local No. 115*, 495 A.2d 579 (Pa. Super. 1985) ("*Solvent Machinery*"), in support of their argument of trial court error. *See* Local 690's Brief at 11; Local 692's Brief at 11. Both Local 690 and Local 692 quote *Solvent Machinery* for the proposition that, "By its own terms, the [LAIA]'s exclusionary provision [of § 206d(d)] 'requires that employees or their organization seize … property *with the intention of compelling the employer to accede to their demands*."

---

protesters at Gate A never broke stride and left no ability for any vehicle to enter the construction site. *Id.* at 12. Rickets stated that during the protest, a delivery truck that was waiting on the road and intended for an onsite contractor could not enter the construction site and had to be sent back. *Id.* at 19. Ricketts further testified that a cement pump truck was unable to enter through the proper gate, Gate A, because it could not get through the protesters. *Id.* at 42. The pump truck ultimately got through to the construction site using Gate B, which was "not … the proper gate." *Id.*

Our standard of review requires that we affirm the trial court's decision "if there were any apparently reasonable grounds for [its] action." *Giant Eagle Markets Co.*, 652 A.2d at 1291. Therefore, based upon standard by which we review the trial court's decision in this matter, as well as the previously cited Supreme Court precedent, I agree that the protesters' act of walking in a circle, blocking Gate A in its entirety, which resulted in the denial of access to the property, described hereinabove, constitutes a seizure. *See id.* at 1292; *Westinghouse Elec. Corp.*, 118 A.2d at 181; *Westinghouse Elec. Corp.*, 46 A.2d at 21; *Carnegie-Illinois Steel Corp.*, 45 A.2d at 861.

*Id.* (emphasis in the original). As both of these appellants raise the argument that the protesters' intent is a necessary element that must be considered for § 206d(d) to be applicable, the Majority's concern about consideration of this issue sua sponte is unfounded. *See* Maj. Op. at 28-29.

In *Solvent Machinery*, this Court found that the failure to present evidence of the protesters' intent in striking at the plaintiff's property was, in part, fatal to the trial court's determination that section 206d(d) applied. *Solvent Machinery*, 495 A.2d at 580-81. In *Solvent Machinery*, the owner of the company announced that the plant had been sold and would close immediately for inventory. The next day, Teamsters Local 115 ("Local 115") established a picket line to protest their termination from employment. Solvent Machinery sought a preliminary injunction, which the trial court granted, concluding that pursuant to section 206d(d), the LAIA did not apply. On appeal, this Court reversed. Although Solvent Machinery presented evidence of property damage, this Court found no evidence presented that the protesters caused the damage. Further, and of particular relevance here, the Court determined that "[t]here was absolutely no evidence presented by either side which linked the property damage to an intention to compel [Solvent Machinery] to do anything – in fact, the record does not reveal precisely what [Local 115]'s demands were." *Id.* at 580. We therefore concluded that the case was governed by the LAIA. Because the trial court failed to make the requisite findings for (and the record did

not support) the issuance of a labor injunction under the LAIA, we reversed the trial court's order. *Id.* at 580-81.

My review of the record reveals that, as in *Solvent Machinery*, there was no evidence presented at the hearing regarding the intent of the picketers, let alone that the union groups that participated in the July 9 protest were doing so to compel Turner "to accede to any demands, conditions, or terms of employment, or for collective bargaining." 43 P.S. § 206d(d). Therefore, I would conclude that this case is governed by the LAIA. *See Solvent Machinery*, 495 A.2d at 580-81; *see also Indiana Cobra, Inc. v. United Food & Commercial Workers Local No. 23*, 594 A.2d 368, 371 (Pa. Super. 1991) (finding that threatening language by a protester without evidence that the threat was made "with the intention of compelling [the plaintiff] to accede to [the protestors'] demands as required by the seizure exception to the [LAIA]," rendering section 206d(d) inapplicable), *appeal denied*, 608 A.2d 30 (Pa. 1992).

The question then remains whether the trial court properly issued the inunction under the LAIA. The opening paragraph to section 206d of the LAIA states:

> No court of this Commonwealth shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case included within this act, except in strict conformity with the provisions of this act, nor shall any such restraining order or temporary or permanent

injunction be issued contrary to the public policy declared in this act.

43 P.S. § 206d. Section 206i of the LAIA sets forth the requirements for the issuance of a labor injunction:

> No court of this Commonwealth shall issue any restraining order or a temporary or permanent injunction in any case involving or growing out of a labor dispute, except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of fact by the court to the effect—
>
> (a) That unlawful acts have been threatened and will be committed unless restrained, or have been committed and will be continued unless restrained, but no temporary or permanent injunction or temporary restraining order shall be issued on account of any threat or unlawful act, excepting against the person or persons, association or organization, making the threat or committing the unlawful act, or actually authorizing or ratifying the same after actual knowledge thereof.
>
> (b) That substantial and irreparable injury to complainant's property will follow unless the relief requested is granted.
>
> (c) That, as to each item of relief granted, greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by granting of relief.
>
> (d) That no item of relief granted is relief which is prohibited under section [206(f)] of this act.
>
> (e) That complainant has no adequate remedy at law; and

(f) That the public officers charged with the duty to protect complainant's property are unable to furnish adequate protection.

43 P.S. § 206i (footnote omitted).

The union groups assert that the record does not support a finding that the public officers charged with the duty to protect the construction site are unable to provide adequate protection, as required pursuant to section 206i(f). Local 14's Brief at 16; Local 690's Brief at 15 n.5; Local 692's Brief at 15 n.5. Although the trial court states that it issued the injunction under the traditional rules of equity,[6] in the first paragraph of the July Injunction, it

---

[6] The elements for the issuance of a preliminary injunction under the traditional rules of equity differ from those required for the issuance of a labor injunction under the LAIA. For a preliminary injunction to issue under traditional rules of equity, the petitioner must establish all of the following six prerequisites:

> First, a party seeking a preliminary injunction must show that an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages. Second, the party must show that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings. Third, the party must show that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct. Fourth, the party seeking an injunction must show that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits. Fifth, the party must show that the injunction it seeks is reasonably suited to abate the offending

nonetheless listed in a cursory fashion the elements required for the issuance of a labor injunction under the LAIA and concluded that each was met.[7]  **See** July Injunction, 7/18/14, at 2.

My review of the record reveals that there was no evidence presented that the members of law enforcement that responded to the construction site on July 9 were unable to provide protection.  To the contrary, Ricketts testified that he called the Upper Marion Police dispatch to report vehicles allegedly associated with the protest blocking traffic, and he admitted that

---

activity. Sixth, and finally, the party seeking an injunction must show that a preliminary injunction will not adversely affect the public interest.

**Gati v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.**, 91 A.3d 723, 728-29 (Pa. Super. 2014) (quoting **Summit Towne Centre, Inc. v. Shoe Show of Rocky Mt., Inc.**, 828 A.2d 995, 1001 (Pa. 2003)), *appeal denied*, 105 A.3d 737 (Pa. 2014).  "Failure to establish any prerequisite is fatal to the injunction." **Id.** at 729.

[7]  The appellants also challenge the trial court's failure to make detailed findings of fact in support of each element under section 206i.  **See** Local 14's Brief at 15-16; Local 690's Brief at 14-15; Local 692's Brief at 15.  All of the cases relied upon by the union groups in support of this proposition address situations wherein the trial court failed to make any finding whatsoever with respect to some or all of the required elements. **See, e.g.,** **DeWilde v. Scranton Bldg. Trades & Const. Council**, 22 A.2d 897, 899 (Pa. 1941); **Indiana Cobra, Inc.**, 594 A.2d at 372; **PHK-P, Inc. v. United Food & Commercial Workers Union, Local 23**, 552, 554 A.2d 519, 523 (Pa. Super. 1989).  As stated above, the trial court did make bare findings in the July Injunction that all elements under section 206i were met.  **See** July Injunction, 7/18/14, at 2.  No case has discussed precisely what is required for the trial court to fulfill the mandate of section 206i that the trial court make "findings of fact" prior to issuing a labor injunction under the LAIA. **See** 43 P.S. § 206i.  Based upon my conclusion that there was insufficient evidence to support the issuance of the injunction pursuant to section 206i(f), I do not address this issue of first impression.

the police were able to abate that problem. N.T., 7/14/14, at 32. Although Ricketts testified that the representatives from the Sheriff's Department who responded to the construction site did not open the gates, there was no evidence that this was because the public officers were **unable**, as opposed to unwilling to do so. *See id.*; *see also Phar-Mor, Inc. v. United Food & Commercial Workers Union Local 1776 AFL-CIO, CLC*, 632 A.2d 913, 917 (Pa. Super. 1993) ("police refusal to take action without a court injunction does not constitute evidence that they were unable to furnish adequate protection"), *aff'd by evenly divided Court,* 660 A.2d 583 (Pa. 1995); *but see Phar-Mor, Inc.*, 660 A.2d at 591 (Opinion in Support of Reversal) ("Unwillingness of the police to intervene is equivalent to an inability to protect the property rights of the complainant.").

Turner had the opportunity to call additional witnesses at the July 14 hearing. In fact, the record reflects that it had Sergeant Adam Berry from the Sheriff's Department present to testify, but chose not to call him. *See* N.T., 7/14/14, at 38, 55. Case law establishes that a plaintiff seeking to enjoin picketing on its property must present direct evidence in support of its case, and cannot simply rely on inferences, speculation and conjecture. *See, e.g., Giant Eagle Markets Co. v. United Food & Commercial Workers Union, Local No. 23*, 652 A.2d 1286, 1287-90 (Pa. 1995); *Westinghouse Elec. Corp. v. United Elec., Radio & Mach. Workers of Am. (CIO) Local 601*, 46 A.2d 18-20 (Pa. 1946); *Cleveland Asphalt Inc.*

*v. Coal. For a Fair & Safe Workplace*, 86 A.2d 271, 280 (Pa. Super. 2005).

As this Court previously held, where "[t]here was no evidence presented at the hearing that the public officers were unable to furnish adequate protection[,] … the trial court lacked the statutory basis to issue the preliminary injunction." *Solvent Machinery*, 495 A.2d at 581. Therefore, I would conclude that the trial court erred by entering the preliminary injunction in this case.

Based upon my conclusion that the LAIA applies and that the trial court erred by issuing the July Injunction,[8] I would further remand the case,

---

[8] Because I conclude that the trial court erred by issuing the July Injunction, I do not discuss the particular terms of the July Injunction. I note, however, that although I agree with the learned Majority that the trial court's limitation as to the number of pickets permitted to be present at the construction site (five) is unreasonable and unsupported by the record, I disagree with its conclusion that the distance limitation (twenty-five feet from any entrance) is reasonable or supported by the record. *See* Maj. Op. at 45-47. The Majority states that the April Injunction "was utterly ineffectual," as the appellants did not abide by its requirement that only five pickets man each entrance to the construction site and the remaining demonstrators stand at least twenty-five feet away from the entrances. Maj. Op. at 44. The April Injunction, however, was only directed to Local 690, "together with their representatives, agents, servants, sympathizers, members and all others action on their behalf or in concert with them." April Injunction, 4/22/14, ¶ 2. As stated hereinabove, there is no evidence that the April Injunction applied to the relevant defendants.

Labor picketing that is free from coercion, intimidation and violence is a form of assembly and speech, protected by the First Amendment to the United States Constitution and Article I, Section 7 of the Pennsylvania Constitution. *Giant Eagle Markets Co.*, 652 A.2d at 1292. "An order issued in the area of First Amendment rights must be couched in the narrowest terms that will

as requested by Local 14, for Turner "to pay reasonable costs and expenses of defending the suit and a reasonable counsel fee" to the union group defendants. 43 P.S. § 206q; Local 14's Brief at 16-17; *see also Indiana Cobra, Inc.*, 594 A.2d at 372-73 ("Having determined that the injunction was improperly granted, we must remand this case for a determination of an award of attorney fees and reasonable costs and expenses incurred by appellant in defending this suit.").

Based on the foregoing, I respectfully dissent.

---

accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order." *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183 (1968). In my view, reducing the number of pickets permitted to peacefully and lawfully protest at the gates of the construction site and restricting additional pickets to a lesser distance limitation would serve the trial court's goal of "abat[ing] the blockade of the [c]onstruction [s]ite." *See* Trial Court Opinion, 10/9/14, at 12. There is no basis in the record, and the trial court provides no explanation for me to determine, that "there were any apparently reasonable grounds for the lower court's action." *Giant Eagle Markets Co.*, 652 A.2d at 1291.